# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In Re:<br><br>**Parkinson Seed Farm, Inc.,**<br><br>Debtor. | **Bankruptcy Case No. 18-40412-JMM** |
| **Parkinson Seed Farm, Inc.,**<br><br>Plaintiff,<br><br>vs.<br><br>**Arlo Weeks and Brookside, LLC,**<br><br>Defendants. | **Adv. Proceeding No. 20-08039-JMM** |

## MEMORANDUM OF DECISION

**Appearances:**

> William Stuart Tabard Wood, Portland, Oregon, Attorney for Plaintiff.
>
> Matthew Todd Christensen, Boise, Idaho, Attorney for Defendants.

### *Introduction*

Parkinson Seed Farm, Inc. ("PSF" or "Plaintiff"), by and through Matthew

McKinlay, its Plan Administrator (the "Plan Administrator"), commenced this adversary

MEMORANDUM OF DECISION – 1

proceeding on May 14, 2020. Dkt. No. 1.[1] Arlo Weeks and Brookside, LLC (collectively,

"Defendants") filed an answer on June 10, 2020. Dkt. No. 4. The trial was held on July

14 and 15, 2021, and the parties provided oral closing arguments. Dkt. Nos. 45, 46, and

49. The Court subsequently deemed the matter under advisement. Having now

considered the extensive record, applicable law, and parties' arguments, the Court makes

the following findings of fact and conclusions of law. Rules 7052; 9014.

### *Findings of Fact*

A.    <u>General Background</u>

Dirk Parkinson was PSF's president and CEO from its inception in 1996 up to and

through part of the company's chapter 11 bankruptcy. Mr. Parkinson was in charge of all

farm operations and finances. At times, although there was no formal method for

determining when to do so, Mr. Parkinson used PSF funds for his own personal expenses.

PSF filed a chapter 11 bankruptcy petition on May 15, 2018. *In re Parkinson Seed

Farm, Inc.*, 18-40412-JMM (Bankr. D. Idaho 2018), Dkt. No. 1.[2] At the time, PSF was

represented by the Robinson & Cotten law firm. On June 6, 2019, creditor Compeer

---

[1] Unless otherwise indicated, all chapter references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, and all Civil Rule references are to the Federal Rules of Civil Procedure, Rules 1–86.

[2] Pursuant to Federal Rule of Evidence 201, this Court, on its own, can take judicial notice of information that is generally known within its jurisdiction or can accurately be determined from sources whose accuracy cannot be reasonably questioned. That includes taking notice of its own docket in the underlying case. *Hillen v. Specialized Loan Servicing, LLC (In re Leatham)*, 2017 WL 3704512, *2 (Bankr. D. Idaho Aug. 24, 2017).

MEMORANDUM OF DECISION − 2

Financial filed a motion to dismiss the case or, in the alternative, appoint a chapter 11

trustee. 18-40412-JMM, Dkt. No. 249. Other creditors objected to the motion to dismiss,

but requested the appointment of a chapter 11 trustee under § 1104(a) as an alternative

remedy pursuant to § 1112(b)(1). During a hearing on the matter on June 21, 2019, PSF,

Compeer Financial, and other creditors agreed to the appointment of a chapter 11 trustee

and the motion to dismiss was deemed moot. 18-40412-JMM, Dkt. No. 269. On June 24,

2019, this Court, for good cause shown, entered an order appointing the chapter 11

trustee, Gary Rainsdon ("Trustee"). 18-40412-JMM, Dkt. No. 272.

On March 3, 2020, this Court entered an order confirming a chapter 11 plan

submitted by creditor SummitBridge National Investments VI, LLC. 18-40412-JMM,

Dkt. No. 603. That plan provided for the appointment of Matthew McKinlay as the Plan

Administrator.

Mr. McKinlay was also certified as an expert witness in this case, and while he

testified at trial as a lay witness as a representative of PSF, he also provided expert

testimony on the accounting software, systems, and processes PSF used in its operations,

as well as its insolvency. *See* Dkt. Nos. 26, 28, and 31. Shortly after his appointment, Mr.

McKinlay requested and was granted access to PSF's financial records. He reviewed

numerous documents related to PSF's financial status and discovered several

discrepancies.

In Mr. McKinlay's expert opinion, PSF was insolvent under a "cash flow

insolvency" standard, meaning it could not pay its bills as they became due, no later than

MEMORANDUM OF DECISION – 3

April 2016 and for all periods thereafter, and PSF was insolvent under a "balance sheet standard," meaning that PSF's liabilities exceeded its assets, no later than the fourth quarter of 2016 and for all periods thereafter. Moreover, Mr. McKinlay testified that Defendants received more than they would have received had this case been filed under chapter 7 of the Code.

In addition, Mr. McKinlay testified that Arlo Weeks ("Weeks") and Brookside, LLC ("Brookside") received higher compensation than they should have received for the type of work they performed, a description of which is discussed below. Mr. McKinlay, in his expert opinion and as one who has experience hiring and staffing financial controllers and business administrators, estimated Weeks should have received $60,000–75,000 per year for the type of work he performed. Mr. McKinlay testified that the payments to Defendants between 2014 and 2018 caused PSF to become insolvent and that payments were made at the expense of other creditors.

After his appointment, Mr. McKinlay retained the law firm Sussman Shank to represent PSF. On May 13, 2020, Mr. McKinlay, on behalf of PSF, filed numerous adversary proceedings, including the immediate case.

B.    Arlo Weeks' Relationship with PSF

Weeks, who has about sixteen- or seventeen-years of financial experience, began working for PSF around 2003. At first, Weeks handled a limited set of duties, such as keeping checkbook balances, organizing information submitting it to others for review, and working collaboratively with PSF's Certified Public Accountant ("CPA"). No one at

MEMORANDUM OF DECISION – 4

PSF worked with the finances more closely than Weeks with the exception of Mr. Parkinson. In fact, throughout his employment at PSF, Weeks did not report to anyone other than Mr. Parkinson because, according to Weeks, Mr. Parkinson was "a one man show."

PSF's relationship with Weeks was never reduced to a written employment agreement. In Weeks' early days with PSF, he collected around $100,000 per year in compensation. Weeks' role eventually expanded to include a broader array of responsibilities. While PSF had other farm managers, there were no other administrative managers that filled the same role that Weeks would eventually occupy.

Sometime around 2012, Weeks and PSF agreed that Weeks' compensation would increase to $135,000 per year and, again, there was no written employment agreement defining the parties' relationship. The agreed-upon increase in compensation was a reflection of Weeks' quality and quantity of work. The checks to Weeks, however, reflect a different amount. Even though Weeks and PSF agreed that Weeks would receive $135,000 per year, Weeks actually continued to receive only about $100,000 annually, approximately $8,333 per month. Weeks issued his paycheck on behalf of PSF, and said he issued the lesser amount to ensure his pay was always below the agreed-upon amount. He was concerned that he might make an error with respect to his salary and wanted to make sure that, should any error occur where he took more money from PSF, there was a buffer between the amount he had actually received and the agreed-upon amount. Mr. Parkinson believes the amount paid to Weeks was fair based on the services provided.

MEMORANDUM OF DECISION − 5

Mr. Parkinson authorized Weeks to distribute such checks and knew the amount that was being disbursed each month.

Around the time Weeks and PSF agreed to the increased salary, Weeks' scope of work broadened. For example, he added more tools to the database to manage the farm and aid in crop planning and management. He also improved and expanded the services he provided PSF related to both the spatial and nonspatial databases.

Weeks testified that he may have been a W-2 employee in his first year with PSF but since then has not received a W-2. In other words, Weeks was an independent contractor that provided services to PSF, although he also testified that he has never received a 1099 Form from PSF. Weeks has no professional degrees but does possess a Master's in Business Administration.

C.    Weeks' Responsibilities at PSF

As stated above, Weeks' initial responsibilities were fairly limited, but eventually he was performing a broad array of tasks for PSF, such as business administration, management, finances, human resources, and information technology management. Weeks was also tasked with entering information into PSF's QuickBooks account but, ultimately, Mr. Parkinson was in charge of the QuickBooks. In fact, while Weeks was the one who entered all information into QuickBooks, in his opinion, that data was not, and should not be considered, accurate until it was reviewed by Mr. Parkinson. Weeks would also generate the QuickBooks reports that were sent to lenders, sometimes on a regular

MEMORANDUM OF DECISION – 6

basis, such as monthly, and other times on demand. Mr. Parkinson reviewed these reports before they were sent to lenders or banks.

Weeks also maintained PSF's budget, which PSF tracked through either Microsoft Excel or Microsoft Access. After 2015, most of the company's finances were tracked through Excel. Weeks testified Excel was used for "number crunching." For example, the main report delivered to KeyBank[3] for review was created via Excel; the company kept track of its fertilizer quantities through Excel, and Excel tracked the company's potato inventories. PSF used Access as a crop management system to track receivables from vendors as well as the company's grain inventories.

Access served other purposes, for which Weeks was in charge. For example, he created and maintained numerous tables in Access, which pulled information from thousands of data entries input by Weeks, to generate functional, collated reports, work orders, or purchase orders that allowed PSF to more accurately conduct crop planning thus giving greater control over what was going on at the farm. The information input into the system rolled over from year to year, thereby enabling the system to utilize larger data pool sets for each year that PSF used Access in its operations.

---

[3] KeyBank National Association ("KeyBank") was the lender that provided most of the operating loans to PSF in numerous years prior to the chapter 11 Petition and held various liens including but not limited to liens on PSF's crops and accounts. KeyBank filed a proof of claim in the amount of over $19,747,854.77 in the bankruptcy case. On January 13, 2019, after the Petition, KeyBank assigned its claim to SummitBridge National Investments VI, LLC. *See* Dkt. No. 187.

MEMORANDUM OF DECISION – 7

Weeks was also in charge of printing and "stamping" checks with Mr. Parkinson's signature. Weeks never issued any check that Mr. Parkinson did not previously authorize. Mr. Parkinson authorized Weeks to print and stamp the checks for regular, ongoing expenses such as payroll and power bills, although Mr. Parkinson would not necessarily review every check before it was delivered to the payee. If there was a check being issued for an expense that was not regular, Weeks would still print and stamp the check, but Mr. Parkinson would review the expense either in Excel or in QuickBooks before the check was delivered.

D.    Brookside, LLC

Sometime around 2008 or 2009, Weeks began talking with Mr. Parkinson about retirement. At the time, Weeks had no real plan for his own retirement, despite being around 60 years old, but his goal was to continue working for PSF while setting up a personal retirement fund for use when he eventually stopped working.

In 2011, Weeks sent either a letter or an email to Mr. Parkinson entitled "Growth Framework." Ex. 101. In that document, Weeks laid out his plan for building his own personal "balance sheet." Weeks submitted a written plan to Mr. Parkinson where Mr. Parkinson, or PSF, would leverage its collateral pool to help Weeks purchase land, and then Weeks would rent the land back to PSF. Any revenue created would be retained by PSF, but the rental payments would essentially pay off the land and once it was paid off, Weeks would keep the land and the equity therein. On this document, Weeks made a

MEMORANDUM OF DECISION − 8

handwritten note that "Dirk said ok," but Mr. Parkinson testified that he does not recall ever approving this plan.

In December 2012, Weeks sent another letter or email to Mr. Parkinson, again entitled "Growth Framework," that laid out Weeks' personal financial plan. The exact proposal is not all that clear. He essentially asked for Mr. Parkinson's help in setting up a "mini-version" of what Mr. Parkinson did. Weeks proposed that he would create a holding company that would enable him to grow real estate equity over a ten-year period, and he would set up a farm operating company that provided services to PSF. Again, Weeks provided no specific details on how he would achieve these goals.

Sometime before 2014, Mr. Parkinson began chiding Weeks about the amount of work Weeks was performing for PSF and expressed interest in bringing someone in to assist Weeks with the "detail" work. Weeks was not interested in bringing in a farmhand to the office but, rather, he wanted to bring someone in from the outside to assist him. In 2014, Weeks fell ill, and Mr. Parkinson told Weeks it was time to bring in and train outside help in case Weeks was to "go away."

In May 2015, Weeks sent yet another document to Mr. Parkinson asking him to help him set up "a new little business." Ex. 103. This is the first letter that mentioned the company "Brookside." Weeks asked Mr. Parkinson for his help in forming Brookside, which would provide services to PSF and, according to the letter, would provide services to other farming companies as well. Brookside's primary purpose was to help Weeks with his "personal equity goals." Weeks could not financially start a company on his

MEMORANDUM OF DECISION − 9

own; he needed Mr. Parkinson's help to get started. Weeks' new company required
$10,000 per month to operate. In essence, the proposed plan called for PSF or Mr.
Parkinson to provide $5,000 and Weeks would provide the other $5,000 per month to
operate the business when it first began. The plan also called for Weeks to reduce his
personal income year by year for a period of time until the business was fully operational
on its own.

The document provided that, should Mr. Parkinson or PSF help the company
financially, it would cost approximately $60,000 the first year, approximately $45,000
the second year, and approximately $30,000 the third year. Weeks also stated that to help
recover these costs, he would provide PSF with "variable rate technology and service in
place by [May 2016] and forward to more than offset that cost with mutually agreed upon
savings/benefits from fertilizer inputs."

Weeks stated that he would continue to provide the same services that he had
already been providing, and that he would manage some of the work at PSF through
Brookside employees. Weeks also stated that "[a] significant portion of [Brookside
employees'] time during the first two years will be devoted to PSF work."

Weeks formed Brookside on May 6, 2015, Ex. 104, with the aspiration that it
would service more than one client in the future. All parties agreed neither Mr. Parkinson
nor PSF would ever be owners of Brookside. Even though the original plan called for
Weeks to reduce the personal income he received from PSF, that never actually
happened. Weeks continued to receive his normal compensation even after Brookside

MEMORANDUM OF DECISION − 10

began operating and was receiving money from PSF. Moreover, Weeks never personally
contributed $5,000 in accordance with the plan set forth in Ex. 103. But, as stated above,
Weeks was already receiving about $35,000 less per year than what he and PSF had
previously agreed to. Like PSF's relationship with Weeks, no written agreement ever
existed between the parties.

Mr. Parkinson also wanted to expand PSF's farm ground mapping capability and
Brookside offered an opportunity to fill that gap. At the time, Weeks' son was helping at
the PSF office. According to Weeks, another reason for starting this company and hiring
new employees rather than bringing employees on PSF's payroll was that Weeks' son
wanted employer-provided health insurance, which PSF did not offer.

PSF contributed money to Brookside and Brookside provided services to PSF.
Weeks testified that PSF's monthly contribution to Brookside was to cover operating
expenses and was made without any expectation of return or profit from Brookside.
These operating expenses included the cost of acquiring equipment, such as GIS mapping
equipment. The original agreement called for PSF to pay Brookside $10,000 per month
for its services. The monthly payment, however, was actually closer to $8,000, but may
have varied from time to time. Weeks, being in charge of issuing checks on behalf of
PSF, voluntarily issued a lesser amount to Brookside to make sure the funds provided
were below the agreed upon amount, as he had done with his own paycheck. Brookside
employees were paid from these funds. PSF also reimbursed Brookside for any expenses
it advanced to third parties on behalf of the farm, such as for mapping and server

MEMORANDUM OF DECISION – 11

software. Mr. Parkinson believes that the amount PSF paid to Brookside was fair based on the services provided, even though PSF was also paying Weeks for his services simultaneously. At trial, Mr. Parkinson testified that he knew the difference between Weeks and Brookside and knew what services each provided, but had difficulty articulating that difference.

Weeks issued checks to Brookside on behalf of PSF using Mr. Parkinson's signature stamp. Weeks would input the payee information and amount into PSF's QuickBooks system, print the check, stamp Mr. Parkinson's signature to the check, and deliver the check to Brookside. Brookside did not perform any work that was not first authorized by Mr. Parkinson. Mr. Parkinson authorized Weeks to distribute such checks and knew the amount that was being disbursed each month.

Brookside eventually had employees, which included Weeks' children. When Brookside would pay its employees, PSF would reimburse Brookside for those expenses. Brookside eventually performed work for other companies as well, including Idaho Springs Water Company. The work performed included human resources, bookkeeping, and payroll work; the same type of work that Weeks performed for PSF. At times, PSF paid Brookside for work performed for Idaho Springs Water Company, which Weeks agreed should not have been paid by PSF.

PSF had Geospatial Information Systems (GIS) map its fields as far back as 2003 and perhaps even earlier, but it was rudimentary. Brookside provided greater capability, and PSF paid the company to provide these services. The purpose of using GIS to map a

MEMORANDUM OF DECISION – 12

field is to employ chemicals and fertilizers more efficiently. It works this way: PSF would take soil samples of the farm ground to determine what chemicals or fertilizer might be needed in specific areas of the farm and would upload this information to Brookside's GIS software. Using the GIS software, Brookside would download the information onto a card which was inserted into the control system of the tractor spreading the chemicals and fertilizer. The system would automatically adjust the output of chemicals and fertilizers based on the geographic location of the tractor and the soil data that had been entered into the system. This made chemical and fertilizer application more efficient and cost-effective because the tractor operator did not need to adjust the output manually while working the field and exact quantities of chemicals and fertilizers could be applied to prevent excess use and cost. In short, the GIS software allowed PSF to automate the chemical and fertilizer process making it more efficient and cost-effective while simultaneously increasing crop yield output.

PSF purchased the GIS equipment between March and September 2016. *See* Exs. 210-59 and 210-82 (checks issued from Brookside to Electronic Data Solutions for field data gathering equipment and hardware that collects data to be saved onto the server for input into the GIS software). Brookside, however, not PSF, owned the equipment. Prior to these purchases, PSF only had some antiquated hardware that did not have the full capability that this service afforded.

MEMORANDUM OF DECISION – 13

E.    Meeting with Chapter 11 Trustee, Gary Rainsdon

As stated above, on July 10, 2019, Gary Rainsdon was appointed as Trustee in this case in response to Compeer Financial's motion to dismiss or motion to appoint a chapter 11 trustee. About a week after his appointment, Trustee requested access to PSF's books and records through a meeting with Mr. Parkinson at PSF's facility. When Trustee arrived, he was greeted cordially and shown around by Mr. Parkinson. Eventually, Weeks joined Trustee and Mr. Parkinson in Mr. Parkinson's office.

After Trustee told Mr. Parkinson he would need access to all of PSF's books, records, systems, and financial records, Mr. Parkinson asked Trustee to step out of the office so that Weeks and Mr. Parkinson could converse privately. Trustee waited for about thirty minutes before Mr. Parkinson invited Trustee back in and informed him he had not yet decided whether he would provide Trustee with all the books and records. Trustee testified that, rather than the cordial welcome Trustee had received upon his arrival, after Trustee requested access to books and records, that Mr. Parkinson became stand-offish, and Trustee left PSF's facility.

Trustee continued his quest to gain access to PSF's records through phone calls and emails to Mr. Parkinson. He also informed Mr. Parkinson that he needed to contact Weeks directly to be the day-to-day bookkeeper on behalf of the estate. It was around this time that Weeks decided to cease working for PSF, and, although Weeks had sent some PSF records to Trustee before his departure, Trustee never hired Defendants to perform any work on behalf of the estate.

MEMORANDUM OF DECISION − 14

Trustee never received full access to PSF's books and records. As a result, Trustee was unable to review all company activity leading up to and through the bankruptcy to determine whether any action needed to be taken regarding preferences or transfers. Trustee filed a motion for turnover to receive complete access to PSF's books and records and eventually received access to most of those records. Dkt. Nos. 355, 395, and 440. After a plan was confirmed, Trustee was replaced by the Plan Administrator.

F.      Changes to QuickBooks Records

QuickBooks is accounting software that companies use to accomplish a wide variety of tasks, including tracking payables, receivables, and payroll. The Plan Administrator, who also testified as an expert witness in this case, found PSF's QuickBooks records to be fairly reliable as a cash-based accounting system that was accurate when tracking expenditures and deposits, but not very accurate when tracking receivable or payables, which is generally in line with Weeks' testimony about the way PSF used QuickBooks.

QuickBooks also generates an audit report that indicates every time something in the system is changed but, to maintain the integrity of the system, the audit report itself cannot be changed. For instance, a QuickBooks user can, after the fact, change a payee to whom a check was issued, or change the expense account from which a check was drafted, and the audit report will track the original payee, the original expense account, as well as each change to those items.

MEMORANDUM OF DECISION – 15

After being appointed as the Plan Administrator, Mr. McKinlay reviewed PSF's audit report. It revealed that Weeks made numerous changes to PSF's QuickBooks records, which, according to Weeks, were changes made at Mr. Parkinson's direction. Although PSF's annual budget was "officially" created and tracked via Microsoft Excel and was not created or tracked in QuickBooks, PSF did use QuickBooks for other purposes, such as tracking individual expenses. In addition, PSF attached some of its QuickBooks records, including its profit and loss statements, to its chapter 11 petition.

Weeks and Mr. Parkinson testified that PSF used QuickBooks only as an internal checkbook register but that it really could not be relied upon for any other purpose, even though Weeks produced QuickBooks reports to send to lenders. In other words, they testified that PSF used QuickBooks to track incoming and outgoing deposits and expenditures and nothing more. And, while most, but not all, PSF checks were printed and issued from QuickBooks, that software tracked all of PSF's outgoing checks, whether issued from QuickBooks or not.

Weeks and Mr. Parkinson were the only people with access to PSF's QuickBooks records, although occasionally PSF's CPA would review the QuickBooks file. The CPA did not produce profit and loss balance sheets using QuickBooks, but used separate software to produce those materials. In fact, PSF placed more reliance on profit and loss balance sheets generated by the CPA's software than it would place on the same documents created from its own QuickBooks records. In this way, some of PSF's official documents came from QuickBooks but some came from other programs.

MEMORANDUM OF DECISION – 16

Some of the changes to PSF's QuickBooks records were made to "reclassify" certain expenditures to satisfy lenders that money was being spent in accordance with loan agreements. KeyBank generally required PSF to: establish an annual budget and to show income and expenses on a monthly basis; agree to not exceed any itemized budget expense item without permission; and report the actual expenses incurred for the particular month as compared to the line item budget.[4] Mr. Parkinson testified that sometimes a monthly expense for one category would arise unexpectedly and cause one budget category to be overdrawn for that one month, even though the long-term or annual budgeted expense for that category was not exceeded. Thus, to avoid the appearance that one of the expense categories for one month exceeded the budget, should an outside lender examine the company books, Mr. Parkinson would direct Weeks to "reclassify" a certain expenditure amount to another category so that the budget would appear balanced for that month. For example, if an expense was classified as "chemicals" in the QuickBooks record, but PSF's "chemical" account exceeded the budget for that month, Mr. Parkinson would direct Weeks to reclassify the expense as "Payable Dirk Parkinson" until room in the budget opened up in the chemical expense category for more expenditures.

---

[4] This same type of accounting with a line-item budget is required by the Court in all reorganization cases concerning the use of cash collateral and obtaining credit, s*ee* LBR 4001.1(a)(3) and (b)(3), and was required in this case when the use of cash collateral was approved after the Petition. *See, e.g.*, Stipulation to Use Cash Collateral, Dkt. No. 70, approved by Order, Dkt No. 90, and Order entered July 18, 2019, Dkt. No. 291.

MEMORANDUM OF DECISION – 17

Specifically relevant to this adversary proceeding, there were changes made to the QuickBooks records with respect to checks issued by PSF to Defendants. For example, many of the checks' payee lines were changed from "Arlo Weeks" to "Weeks Financial." When Weeks first began issuing checks, he changed some of the payee lines in QuickBooks because he was trying to distinguish disbursements to himself as fees versus reimbursements. These changes were made without Mr. Parkinson's direction but after Weeks realized this change was cumbersome and confusing rather than helpful, he stopped making such changes.

Exhibit 109 outlines various checks Weeks received. Numerous checks written to "Arlo Weeks" were changed so it appeared the check was issued to Valley Agronomics. For example, Weeks altered the payee in QuickBooks for check number 31167 in the amount of $8,333.32. Ex. 109F. It was originally issued to Arlo Weeks, but nearly two years after its issuance, Weeks changed the payee to Valley Agronomics in QuickBooks. Weeks testified that all checks that were changed from "Arlo Weeks" to Valley Agronomics as the payee follow the same pattern: changes were made at Mr. Parkinson's direction.

Another example of a change to the payee is check number 31424. Ex. 107, p. 42. Around December 2017, the check was initially issued to the payee Brookside and accounted for as an expense split between the "Payable Dirk Parkinson" and "Labor General" accounts. "Payable Dirk Parkinson" is another category of expense PSF used in its budgeting the same way it would use "chemicals," "seeds," "fertilizer," or "labor." In

MEMORANDUM OF DECISION − 18

June 2018, the expense accounts for this check were changed to "Chemicals" and "Labor Other." In August 2019, the "Chemicals" expense account for the check was changed to "Labor Other." At the same time, the payee for this check was deleted from QuickBooks. The memo line changed at the time of each of these changes as well with one exception that remained consistent: Brookside was always referenced in some way. These changes were made at Mr. Parkinson's direction.

While Weeks could not explain any legitimate reason why someone would change QuickBooks records for a check issued nearly two years prior, Weeks stated simply that he did so at Mr. Parkinson's direction. He testified it was a common practice of Mr. Parkinson, which Weeks gave little thought and never questioned. He did what he was told, despite feeling uncomfortable about it. Mr. Parkinson felt he had the right to make such changes as PSF's president because, in his words, "it was my money." In fact, Mr. Parkinson was not aware of any changes made by Weeks that Mr. Parkinson did not first authorize.

On August 18, 2019, after the hearing with Trustee described below, Mr. Parkinson hailed Weeks to the farm and directed him to make numerous changes to QuickBooks. Mr. Parkinson directed Weeks to delete any reference of Brookside from PSF's QuickBooks records whenever it showed up in the "Payable Dirk Parkinson" expense category. Weeks followed Mr. Parkinson's instructions, deleting Brookside from the payee lines and reclassifying the expenses from "Payable Dirk Parkinson" to either "Labor-General" or "Labor-Other" expense categories. Weeks testified that he believed

MEMORANDUM OF DECISION − 19

he had put "Brookside-Labor" into the memo line for each expense but simply forgot to go back in later and insert Brookside in the payee line. Weeks estimated he made forty changes over two days in August 2019 at Mr. Parkinson's direction. It was also around this time that Weeks made changes to the checks that had originally been made out to "Arlo Weeks" to show that they were made out to Valley Agronomics.

Exhibit 109 contains information on 38 checks in total, and Weeks testified that all 38 checks, at least with respect to those with no payee or Brookside as the payee, follow the same pattern as described above: changes were made to the payee or memo line at Mr. Parkinson's direction. Additionally, Weeks testified that although the actual checks themselves were made out to Brookside for the whole amount, usually about $8,000, the QuickBooks records indicate that the checks were actually divided between two expense accounts in the amount of $4,000 each. The reason the payment was divided into amounts of about $4,000, according to Weeks, is because $4,000 was easier to move around to other expense categories than $8,000 for the sake of maintaining the appearance that the monthly budget was balanced. Obviously, none of the changes made in QuickBooks after the fact had any effect on the previously issued checks.

At Weeks' deposition, he testified he was not sure why QuickBooks had been changed to reflect inaccurate information. At trial, however, Weeks explained that the check information had been changed numerous times at Mr. Parkinson's direction. Those changes are outlined in the PSF QuickBooks' audit trail, a document provided from the QuickBooks system to show any changes that were made to PSF's financial information.

MEMORANDUM OF DECISION − 20

When asked why he had no explanation for the changes at the deposition, but did have one at trial, Weeks explained that he was not allowed to look at PSF's records during the deposition. However, after the deposition, Weeks was able to look through the records and was therefore able to explain the reason for the changes. By looking at the audit trail and other relevant documents, Weeks was able to notice a "pattern" that informed him as to the reason for the change. PSF stopped using QuickBooks as a checkbook register after the bankruptcy was filed and, instead, began using Excel to track expenses.

G.    <u>Postpetition</u>

Defendants continued to work for PSF after the bankruptcy petition was filed. Weeks assisted PSF in preparing for its bankruptcy filing and, although the GIS mapping work decreased postpetition, Brookside continued to assist Weeks with his day-to-day work much the same way it had done prepetition. Weeks testified that he began doing more work for PSF after the bankruptcy petition was filed because he kept performing all his normal tasks plus helped with the bankruptcy, such as preparing documents related to the bankruptcy. A glance through the docket for the underlying case reveals several hearings where Weeks testified on behalf of PSF. *See* 18-40412-JMM, Dkt. No. 569 (providing testimony in response to creditor Compeer's motion in limine to exclude Weeks' testimony at PSF's confirmation hearing); 18-40412-JMM, Dkt. No. 263 (providing testimony on behalf of PSF in support of PSF's motion to use cash collateral); 18-40412-JMM, Dkt. No. 248 (providing testimony on behalf of PSF in support of PSF's motion to use cash collateral and motion to incur secured debt).

MEMORANDUM OF DECISION − 21

Additionally, after Compeer filed its motion to dismiss the case, mentioned above,

PSF filed an exhibit list in preparation for a hearing on the motion. *See* 18-40412-JMM,

Dkt. No. 255-1. The list included numerous exhibits that Weeks helped to prepare, such

as:

| NOS. | DATE | ADMITTED | DESCRIPTION |
|------|------|----------|-------------|
| | | **EXHIBITS** | |
| 100 | | | Core Home Acres vs. Experimental Expansion Acres |
| 101 | | | 2018 Cash Flow Plan and Actual |
| 102 | | | Payments to Key Bank and Summit Financial |
| 103 | | | 2019 Cash Collateral Plan (as of April 30, 2019) |
| 104 | | | Cash Activity (through May 20, 2019) |
| 105 | | | 2019 Cash Collateral Plan (as of May 20, 2019) |
| 106 | | | 2019 Crop Map |
| 107 | | | 2019 Crop Plan Summary |
| 108 | | | 2019 Fert Plan Summary |
| 109 | | | 2019 Chem Plan Summary |
| 110 | | | 2019 Fertilizer and Chemical Payments |
| 111 | | | 2019 Crop Revenues Basis |
| 112 | | | 2020 Cash Flow Plan |
| 113 | | | 2021 Cash Flow Plan |
| 114 | | | 2022 Cash Flow Plan |
| 115 | | | 2023 Cash Flow Plan |
| 116 | | | 2024 Cash Flow Plan |
| 117 | | | 2025 Cash Flow Plan |
| 125 | | | Operating Report for December 2018 – Doc. 174 |
| 126 | | | Notice of Electronic and Operating Report for November 2018 |
| 127 | | | Notice of Electronic and Operating Report for October 2018 |
| 128 | | | Notice of Electronic and Operating Report for September 2018 |
| 129 | | | Notice of Electronic and Operating Report for August 2018 |
| 130 | | | Notice of Electronic and Operating Report for July 2018 |
| 131 | | | Notice of Electronic and Operating Report for June 2018 |
| 132 | | | Notice of Electronic and Operating Report for May 2018 |
| 133 | | | 2019 Cash Flow Plan |
| 134 | | | Revised 2020 Cash Flow Plan |
| 135 | | | Revised 2021 Cash Flow Plan |
| 136 | | | Revised 2022 Cash Flow Plan |
| 137 | | | Revised 2023 Cash Flow Plan |

MEMORANDUM OF DECISION − 22

| 138 | | | Revised 2024 Cash Flow Plan |
| 139 | | | Revised 2025 Cash Flow Plan |

Of course, most of these exhibits were related and compiled in preparation of the hearing on the motion to dismiss. Weeks also participated in other activities not enumerated on the list above. For example, a stipulation between KeyBank and PSF had been entered for the final use of cash collateral that included an attached budget, which Weeks helped prepare. 18-40412-JMM, Dkt. No. 70; Ex. 202. Of import, the Court entered an order approving the stipulation and the budget attached thereto. 18-40412-JMM, Dkt. No. 90; Ex. 203. The budget included a line item expense for "Contract Services" in the amount of $12,000 for the month of June 2018, and then $6,000 per month for the months July 2018 thru April 2019. *Id.* Weeks testified the amount allocated for "Contract Services" was the amount of money set aside to pay Weeks for his services throughout the bankruptcy, and he believed that others involved in the negotiation had the same understanding.

The postpetition cash collateral budget also included line item expenses for "Office Labor" and "Office Expenses," from which PSF paid Brookside for its services postpetition. The amount paid to Brookside covered employee wages and various other expenses. Like Weeks, Brookside also took a lower payment amount postpetition than it received prepetition. Sometimes the $6,000 check for "Contract Services" was issued to Brookside rather than Weeks, but in the months where that occurred, there was ultimately only one $6,000 check issued for "Contract Services." Additionally, postpetition, PSF

MEMORANDUM OF DECISION − 23

issued checks to Brookside for both services and equipment, the amount of which always came in under the budgeted amount in the cash collateral budget. Weeks, however, did not explain to anyone at the cash collateral meetings what Brookside was or the purpose it served. PSF did not issue checks from QuickBooks postpetition but, rather, manually issued checks instead.

Defendants officially stopped working for PSF around July 2019. After Rainsdon had been appointed as Trustee, he reached out to Mr. Parkinson to ask if Weeks would continue to work for PSF on behalf of Trustee and recommended that if Weeks did not wish to do so he should look for other work. Weeks had been working a significant number of hours per week prior to bankruptcy and added additional hours after the filing. Moreover, he suffered personal tragedies and ultimately chose to sever his employment with PSF. He did perform limited services for Mr. Parkinson, such as the August 2019 QuickBooks changes discussed above.

Mr. Parkinson opened a bank account on behalf of PSF after the petition was filed, but did not disclose the account to this Court, Trustee, or Weeks. Only Mr. Parkinson and his wife knew of the account's existence. Mr. Parkinson transferred PSF funds into this account from various sources, including the sale of equipment.

### *Analysis and Disposition*

Plaintiff alleges numerous causes of action in its complaint. First, Plaintiff seeks an order pursuant to §§ 548 and 550, as well as § 544 and Idaho Code §§ 55-913 and 914, avoiding and recovering for the bankruptcy estate prepetition payments made to

MEMORANDUM OF DECISION − 24

Defendants. Second, Plaintiff prays for an order pursuant to §§ 547 and 550, avoiding
and recovering for the bankruptcy estate the prepetition payments to Defendants dated on
or after February 14, 2018. Third, Plaintiff seeks to avoid and recover for the bankruptcy
estate postpetition payments to Defendants pursuant to §§ 549 and 550. Fourth, Plaintiff
alleges that Defendants committed fraud against the Plaintiff and seeks $303,097 for
sums received between 2014 and 2018. Fifth, Plaintiff alleges that Defendants wrongfully
converted PSF funds and seeks $303,097 in damages. Sixth, Plaintiff alleges that
Defendants were unjustly enriched by their actions and seeks $303,097 in damages.
Seventh, Plaintiff alleges that Defendants' action breached their fiduciary duties owed to
Plaintiff and seeks $303,097 in damages. Lastly, Plaintiff seeks attorney fees and costs
incurred in pursuing these causes of action.

A.    Section 548(a)(1) and Idaho Code §§ 55-913 and 55-914

Plaintiff argues that certain transfers from PSF to Defendants are avoidable
pursuant to §§ 548(a)(1)(A) and (B). A trustee may avoid a prepetition transfer of an
interest of the debtor in property that is intentionally fraudulent pursuant to
§ 548(a)(1)(A), or constructively fraudulent under § 548(a)(1)(B). *Official Comm. of
Unsecured Creditors v. Hancock Park Cap. II, L.P. (In re Fitness Holdings Int'l, Inc.)*,
714 F.3d 1141, 1145 (9th Cir. 2013) (citing *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 535,
114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994)). The party seeking to avoid the transfer bears
the burden to prove all the statutory elements by a preponderance of the evidence. *Jordan
v. Kroneberger (In re Jordan)*, 392 B.R. 428, 440 (Bankr. D. Idaho 2008). The Court will

MEMORANDUM OF DECISION − 25

address each Code section in turn.

    *1.    Actual Fraud: § 548(a)(1)(A)*

Section 548(a)(1)(A), in relevant part, provides:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

§ 548(a)(1)(A). The Court will discuss each element individually.

    *a.    Transfers that were made or occurred within two years before the date of the filing of the petition.*

The Code broadly defines "transfer" in § 101(54) as every "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property, or (ii) an interest in property.*" Jordan v. Kroneberger (In re Jordan)*, 392 B.R. at 440.

In this case, the parties do not dispute that the transactions between PSF and Defendants were transfers for the purposes of § 548(a)(1) made within the two years preceding PSF's bankruptcy petition.

    *b.    Actual Intent*

Determining whether a debtor intended to hinder, delay, or defraud creditors in transferring property is a question of fact. *Hopkins v. Crystal 2G Ranch, Inc. (In re*

MEMORANDUM OF DECISION − 26

*Crystal)*, 513 B.R. 413, 418 (Bankr. D. Idaho 2014) (citing *Rainsdon v. Kirtland (In re Kirtland)*, 12.1 IBCR 9, 12 (Bankr. D. Idaho 2012)).

There is rarely direct evidence of a debtor's actual intent to hinder, delay, or defraud; courts, however, may infer such intent from the circumstances surrounding the transfer. *Hopkins v. Crystal 2G Ranch, Inc. (In re Crystal)*, 513 B.R. at 418 (citing *Hasse v. Rainsdon (In re Pringle)*, 495 B.R. 447, 467 (9th Cir. BAP 2013); *Acequia, Inc. v. Clinton (In re Acequia, Inc)*, 34 F.3d 800, 805–06 (9th Cir. 1994)). Inferences of actual fraudulent intent may be drawn from the presence in the facts of certain traditional "badges of fraud," including:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

5 COLLIER ON BANKRUPTCY ¶ 548.04 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2021); *Hasse v. Rainsdon (In re Pringle)*, 495 B.R. at 465 (providing that courts tend to infer the existence of an intentional fraudulent transfer from certain badges of fraud listed above); *see also Hopkins v. Crystal 2G Ranch, Inc. (In re Crystal)*, 513 B.R. at 418 (quoting *Acequia, Inc. v. Clinton (In re Acequia, Inc)*, 34 F.3d at 806).

MEMORANDUM OF DECISION − 27

After the trustee establishes indicia of fraud in an action under § 548(a)(1), the burden then shifts to the defendant to prove a legitimate supervening purpose for the alleged wrongful transfer. *Hopkins v. Crystal 2G Ranch, Inc. (In re Crystal)*, 513 B.R. at 418 (quoting *Acequia, Inc. v. Clinton (In re Acequia, Inc)*, 34 F.3d at 806).

While the record before the Court contains some evidence indicating actual fraud, there is also evidence that no actual fraud occurred. For example, for reasons set forth below in sub-section (2)(c)(2), Weeks is a non-statutory insider under § 101(31)(B) and Ninth Circuit precedent. Moreover, while the transfers were concealed from lenders, the concealment often was only for monthly budgeting purposes and only as to the expense account from which the funds were being allocated, rather than the recipient of the payments. Likewise, after the meeting with Trustee, Mr. Parkinson ordered Weeks to change the QuickBooks records to hide that the payee was "Brookside" for checks issued from the "Payable Dirk Parkinson" expense account and make it appear as though those checks were accounted for in another expense account, such as "fertilizer." In other words, while Weeks initially was involved in concealing from the lender which expense category was being used to account for certain expenses, after the meeting with Trustee he was involved in changing the QuickBooks records to change the payee and to alter the reported expense category to conceal this from Trustee.[5] Additionally, PSF and Mr. Parkinson did not turn over books and records to Trustee after his appointment.

---

[5] While Weeks testified that he did all of this at Mr. Parkinson's instruction, testimony that is not refuted by Mr. Parkinson, it strains Weeks' credibility when the changes being made were to the accounting for

MEMORANDUM OF DECISION – 28

On the other hand, PSF did not retain possession or control of the funds after the checks were issued to Defendants. The transfers were also not substantially all of PSF's assets, nor did PSF abscond after the transfers. PSF eventually became insolvent, and there were transfers to Defendants around the time PSF became insolvent, but there were also monthly transfers to Weeks that began years before insolvency. Although Weeks had sought to establish a business that would assist him in building some type of financial portfolio for his retirement, Brookside actually offered at least some services to PSF and other companies, and was not only a retirement vessel that provided nothing in return. Moreover, both Defendants received less money that the amount they had originally agreed upon with PSF. In addition, Weeks was often at the mercy of Mr. Parkinson; changes made to QuickBooks both pre- and postpetition were made at Mr. Parkinson's direction, not of Weeks' own volition.

"While the presence of a single badge of fraud may spur mere suspicion, the existence of several can constitute conclusive evidence of actual intent to defraud." *Rainsdon v. Gearhart (In re Ford)*, 2021 WL 115552 at *4 (Bankr. D. Idaho 2021). Although there is some indicia of fraud in this case, it is not overwhelming and likely does not satisfy Plaintiff's burden by the preponderance of the evidence. Even assuming it does,

---

checks written earlier to him and to his company, Brookside. It appears that either he was attempting to hide these checks that benefited him or he was attempting to hide that the original expense category accounting showed that a large portion of these expenses were categorized as monies that Dirk Parkinson owed PSF. This Court does not condone this behavior and finds it shocking that Weeks felt no need to simply refuse Mr. Parkinson's direction, particularly when he knew Trustee was asking to review the books and records which included payments to Weeks and Brookside.

MEMORANDUM OF DECISION – 29

having established the requisite indicia of fraud, the burden shifts to Defendants to prove

some "legitimate supervening purpose" for the transfers at issue. *Id.* (citing *Crystal 2G

Ranch, Inc. (In re Crystal)*, 513 B.R. at 418; *Acequia, Inc. v. Clinton (In re Acequia, Inc)*,

34 F.3d at 805–06 (citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926

F.2d 1248, 1254 (1st Cir. 1991))). The legitimate supervening purpose, in this case, is

that Defendants provided at least some services as independent contractors to PSF, and

the transfers constituted payment in return for those services. Whether the value

exchanged is reasonably equivalent is reserved for discussion below.

The Court finds that the evidence of actual fraud is equivocal. Plaintiff bears the

burden of proving all the elements of this cause of action by a preponderance of the

evidence, and that burden has not been met here. Moreover, had the elements been

proven, there is a legitimate supervening purpose for the transfers. Accordingly,

Plaintiff's § 548(a)(1)(A) claim will be denied.

> 2.    *Constructive Fraud: § 548(a)(1)(B)*

Section 548(a)(1)(B), in relevant part, provides:

(a)(1) The trustee may avoid any transfer (including any transfer to or for
the benefit of an insider under an employment contract) of an interest of the
debtor in property, or any obligation (including any obligation to or for the
benefit of an insider under an employment contract) incurred by the debtor,
that was made or incurred on or within 2 years before the date of the filing
of the petition, if the debtor voluntarily or involuntarily—
. . .
> (B)(i) received less than a reasonably equivalent value in exchange
> for such transfer or obligation; and
> > (ii)(I) was insolvent on the date that such transfer was made
> > or such obligation was incurred, or became insolvent as a
> > result of such transfer or obligation . . . or

MEMORANDUM OF DECISION − 30

> (IV) made such transfer to or for the benefit of an insider, or
> incurred such obligation to or for the benefit of an insider,
> under an employment contract and not in the ordinary course
> of business.[6]

§ 548(a)(1)(B). The Court will address each element.

### a. Transfer of Property

Again, "transfer" is broadly defined in § 101(54) as every "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property, or (ii) an interest in property." *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. at 440.

As stated above, the parties do not dispute that the transactions between PSF and Defendants were transfers for the purposes of § 548(a)(1), nor do they contest that the transfers were made within the two years preceding PSF's bankruptcy petition.

### b. Debtor received less than reasonably equivalent value in exchange for the transfer

This element requires the Court to determine the value received by Debtor in exchange for the interest that was transferred to Defendant. Thus, Plaintiff must establish that Debtor "'received less than a reasonably equivalent value' in order to satisfy the requirement of § 548(a)(1)(B)(i)." *Id.* at 441.

---

[6] Plaintiff only argues that §§ 548(a)(1)(B)(ii)(I) and 548(a)(1)(B)(ii)(IV) are applicable but makes no argument with respect to §§ 548(a)(1)(B)(ii)(II) and 548(a)(1)(B)(ii)(III). *See* Dkt. No. 35, p. 30–31.

MEMORANDUM OF DECISION − 31

A two-step analysis is required. First, the Court must determine that the debtor received value, which, for purposes of § 548 is defined as "property, or the satisfaction or securing of a present or antecedent debt of the debtor[.]" *Id*. (citing *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 595 (9th Cir. 1991) (quoting § 548(d)(2)(A))). "A transfer is for value if one is the quid pro quo of the other." *Id*. (citing *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 612 (8th Cir. BAP 2001)). Here, there can be no serious question that PSF received at least some value: the services that Defendants provided.

The second step requires the Court to determine whether that value was reasonably equivalent to what the debtor gave up. *Id.* Determination of "reasonable equivalence" is largely a factual question and latitude is given to the trier of fact. *Id.* (citing *Jacoway v. Anderson (In re Ozark Rest. Equip. Co.)*, 850 F.2d 342, 344 (8th Cir. 1988)). "In order to determine whether a fair economic exchange has occurred, the court must analyze all the circumstances surrounding the transfer in question." *Id.* (citing 5 COLLIER ON BANKRUPTCY ¶ 548.05.[1][b] at 548–35 (Alan N. Resnick & Henry J. Sommer eds., rev. 15th ed. 2007)). "The determination of reasonable equivalence must be made as of the time of the transfer." *Id.* (citing *BFP v. Resol. Trust Corp.*, 511 U.S. at 535, 114 S. Ct. 1757, 128 L. Ed. 2d 556; *Krommenhoek v. Natural Res. Recovery, Inc. (In re Treasure Valley Opportunities, Inc.)*, 166 B.R. 701, 704 (Bankr. D. Idaho 1994); 5 COLLIER ON BANKRUPTCY ¶ 548.05.[1][b] at 548–35 (Alan N. Resnick & Henry J. Sommer eds., rev. 15th ed. 2007)). "Whether a debtor received a reasonably equivalent value is analyzed

MEMORANDUM OF DECISION − 32

from the point of view of the debtor's creditors, because the function of this element is to allow avoidance of only those transfers that result in a diminution of a debtor's prepetition assets." *Id.* "The concept is not particularly esoteric; a party receives reasonably equivalent value if it gets roughly the value it gave." *Id.* at 441–42 (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3rd Cir. 2007)). "Reasonable equivalence does not require exact equality in value." *Id.* at 442 (citing *Kendall v. Carbaat (In re Carbaat)*, 357 B.R. 553, 560 (Bankr. N.D. Cal. 2006); *see also BFP v. Resol. Trust Corp.*, 511 U.S. at 540 n. 4, 114 S. Ct. 1757, 128 L. Ed. 2d 556 ("Our discussion assumes that the phrase 'reasonably equivalent' means 'approximately equivalent,' or 'roughly equivalent.'")). "Indirect benefits, as well as direct benefits, may constitute value if sufficiently concrete and identifiable. . . . 'Beyond looking at what is exchanged in a quid pro quo transaction, it is important to examine the value of all benefits inuring to a debtor by virtue of the transaction in question, directly or indirectly.'" *Id.* (quoting *Hopkins v. D.L. Evans Bank (In re Fox Bean Co.)*, 287 B.R. 270, 281 (Bankr. D. Idaho 2002)).

The Court finds that PSF received reasonably equivalent value with respect to Weeks. PSF paid Weeks approximately $8,333 per month during the relevant lookback period, which equates to roughly $100,000 per year. Mr. McKinlay testified as an expert that he believed that Weeks' services were worth approximately $60,000–$75,000 per year. Weeks began working for PSF sometime around 2003 and, at the time of the transfers, had approximately thirteen to fifteen years' experience in the role, so even

assuming Mr. McKinlay's estimate is accurate, Weeks would be at the higher end of that estimate. Weeks' role, although narrow at the start of his employment, expanded significantly through the years. At the time the transfers took place, Weeks was performing multiple functions for PSF, including business management, human resources, IT, and payroll. Although there were other farm managers, there was no other administrative manager that filled the Weeks role. The Court finds, after taking into account the direct benefits, such as the multitude of services Weeks provided, as well as the indirect benefits, such as having the same person fill that role for many years with the resulting retention of organizational knowledge, the value PSF received was roughly equivalent to the amount it paid to Weeks.

The same cannot be said for the transfers to Brookside made during the relevant lookback period. Brookside's role was similar to that performed by Weeks before Brookside was formed. Brookside largely assisted Weeks in his role as the administrator, performing various office tasks. It did perform some services for PSF, such as mapping and other GIS services, but Brookside was paid approximately $8,000[7] per month for a total of approximately $96,000 per year. Thus, PSF did not receive reasonably equivalent value for the services Brookside provided.

With respect to payments made by PSF to Brookside for reimbursement of fees, the Court finds that PSF did not receive reasonably equivalent value for fees paid to

---

[7] As noted above, sometimes the amount paid was less than $8,000.

MEMORANDUM OF DECISION – 34

Brookside that should have been paid by Idaho Springs Water Company. As discussed below with respect to Plaintiff's fraud claim, PSF reimbursed Brookside for expenses Brookside incurred for services it provided to Idaho Springs Water Company, and Weeks admitted PSF should not have reimbursed Brookside for those fees. That amount is $2,332.

With respect to all other expense reimbursements, the Court finds the Plaintiff has failed to sustain its burden that PSF did not receive reasonably equivalent value for the reimbursements. Weeks testified that Brookside would perform services for PSF and incur fees for those services, for which it would charge PSF. For example, Plaintiff's Exhibit 111 seeks reimbursement for duplicate travel reimbursements. After taking a closer examination of the supporting documents, it appears to this Court that the checks Plaintiff argues are duplicate travel expenses are actually for different amounts and different travelers.

Moreover, Plaintiff seeks reimbursement for fees for DynaQuest hosting services and equipment. Again, Plaintiff fails to sustain its burden with respect to reimbursement for these services. PSF clearly used the DynaQuest servers, even if Brookside paid for the service and then was reimbursed by PSF. Although Mr. McKinlay testified that PSF continues to use DynaQuest but pays a lower amount that it was paying pre-petition, he also testified that the GIS mapping services decreased postpetition. Therefore, Plaintiff has failed to sustain its burden that, at the time, PSF did not receive reasonably equivalent value for those reimbursed expenses.

MEMORANDUM OF DECISION – 35

c.      *Section 548(a)(1)(B)(ii)*

In addition to proving there was a transfer of property and Debtor received less than reasonably equivalent value in exchange for the transfer, Plaintiff must also prove one of either of the following: 1) that Debtor was insolvent at the time of the transfer, or 2) that Debtor made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business. The Court has already determined that PSF received roughly equivalent value to what it gave up with respect to Weeks. Because Plaintiff failed to sustain its burden with respect to that element, the Court does not need to address these other elements with respect to Weeks. *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. at n.35 (determining the Court need not address the other elements because Plaintiff's failed to prove the exchange was not reasonably equivalent). However, because Plaintiff sustained its burden in proving that it did not receive reasonably equivalent value from Brookside for services and certain expenses, and for the sake of being thorough, the Court will address the remaining elements with respect to both Weeks and Brookside.

(1)      Section 548(a)(1)(B)(ii)(I): Insolvency

"Insolvency is defined in § 101(32)(A) as a 'financial condition such that the sum of such [debtor]'s debts is greater than all of such [debtor]'s property, at a fair valuation[.]' A 'balance sheet' standard applies in § 548(a) litigation." *Miller v. Kerstein (In re Miller)*, 536 B.R. 863, 869 (Bankr. D. Idaho 2015) (citing *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1321 (9th Cir. 1989)). In other words, to determine

MEMORANDUM OF DECISION − 36

whether Debtor was insolvent at the time of the transfers, this Court must determine whether Debtor's debts were greater than its assets, at a fair evaluation, exclusive of exempted property. *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d at 1321.

There is strong evidence here indicating that PSF was insolvent at the time of the transfers. Mr. McKinlay was certified as an expert in this case, and testified that PSF was insolvent under a "balance sheet standard," meaning that PSF's liabilities exceeded its assets, no later than the fourth quarter of 2016 and for all periods thereafter. *See also* Ex. 135. Defendants offered no evidence to rebut this testimony. Therefore, the Court finds that, under a balance sheet standard, PSF was insolvent in December 2016 and for all periods thereafter. Accordingly, because PSF received less than reasonably equivalent value from Brookside, PSF will be allowed to recover transfers to Brookside made while PSF was insolvent.

The lookback period for § 548, however, is two years. Because PSF filed its petition on May 15, 2018, the lookback period would extend back to May of 2016. The Court found PSF to be insolvent as of December 2016, which leaves about seven months of the lookback period during which PSF was not insolvent under the balance sheet standard. Plaintiff, however, also argues that the transfers made during the lookback period, including the time period between May and December 2016, were made to benefit an insider under an employment contract and not in the ordinary course of business, which, if proven, does not require the Plaintiff to show that the debtor was insolvent. The Court addresses this argument next.

MEMORANDUM OF DECISION − 37

(2)    Section 548(a)(1)(B)(ii)(III): Benefit an Insider under an
Employment Contract and not in the Ordinary Course of Business

If the debtor is a corporation, as is the case here, the term "insider" includes a

director of the debtor, an officer of the debtor, a person in control of the debtor, a

partnership in which the debtor is a general partner, a general partner of the debtor, or a

relative of a general partner, director, officer, or person in control of the debtor.

§ 101(31)(B).

The Code's use of the word "includes" is not limiting. § 102(3). Many courts have

recognized that the list of what constitutes an insider is non-exhaustive because of the

statute's use of the word "includes." *See U.S. Bank Nat. Ass'n ex rel. CWCapital Asset*

*Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963–64, 200 L. Ed. 2d 218 (2018)

("Because of the word 'includes' in [§ 101(31)(B)], courts have long viewed its list of

insiders as non-exhaustive. . . . The decisions are not entirely uniform, but many focus, in

whole or in part, on whether a person's 'transaction of business with the debtor is not at

arm's length.'").

The Ninth Circuit has recognized that the definition in § 101(31)(B) includes non-

statutory insiders—those insiders that are not be explicitly provided for in the statute:

> Non-statutory insiders are the functional equivalent of statutory
> insiders and, therefore, must fall within the ambit of § 101(31). A creditor
> is not a non-statutory insider unless: (1) the closeness of its relationship
> with the debtor is comparable to that of the enumerated insider
> classifications in § 101(31), and (2) the relevant transaction is negotiated at
> less than arm's length. A court cannot assign non-statutory insider status to
> a creditor simply because it finds the creditor and debtor share a close
> relationship.

MEMORANDUM OF DECISION − 38

> A court must conduct a fact-intensive analysis to determine if a creditor and debtor shared a close relationship and negotiated at less than arm's length. Having—or being subject to—some degree of control is one of many indications that a creditor may be a non-statutory insider, but actual control is not required to find non-statutory insider status. Likewise, access to the debtor's inside information may—but not shall—warrant a finding of non-statutory insider status.

*U.S. Bank v. The Vill. at Lakeridge, LLC (In re The Vill. at Lakeridge, LLC)*, 814 F.3d 993, 1001–02 (9th Cir. 2016), *aff'd sub nom. U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 200 L. Ed. 2d 218 (2018) (internal citations omitted). An "arm's length transaction" is: "1. A transaction between two unrelated and unaffiliated parties. 2. A transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises." *Id.* at n.11 (citing TRANSACTION, BLACK'S LAW DICTIONARY (10th ed. 2014)).

The Court finds and concludes that Weeks was a non-statutory insider for PSF. PSF's relationship with Weeks is comparable in closeness to those specifically enumerated in § 101(31), which includes a director or officer of the debtor, a person in control of the debtor, or a relative of a general partner, director, officer, or person in control of the debtor. Weeks may not be an officer or director of PSF, nor is he related to PSF or Mr. Parkinson, but Weeks worked very closely with Mr. Parkinson for many years before he finally departed his position. Moreover, as stated below in Section G, Weeks was PSF's agent and, therefore, owed PSF fiduciary duties. Through his position, Weeks was certainly privy to PSF's inside information, and even issued checks to

MEMORANDUM OF DECISION – 39

himself, Brookside, and third parties on behalf of PSF using Mr. Parkinson's signature stamp. PSF also employed several of Weeks' children, and PSF controlled the work and conduct of Weeks throughout their entire relationship.

The Court finds, however, that Brookside is not a non-statutory insider for the purposes of this Code section. Although Weeks controlled certain aspects of PSF's business activities, and Weeks was also in charge of Brookside, it is important that these two roles are not conflated simply because of the person in each of those roles. Brookside was certainly more removed from PSF than Weeks. Brookside employed its own staff and did not exercise control over PSF's operations and administration in the same way that Weeks did. Again, although Weeks had sent several letters to Mr. Parkinson concerning a company that could eventually aid him in his retirement, the company that eventually came to fruition did provide at least some services to PSF and was not just a retirement vehicle that provided nothing in return. Moreover, Brookside provided services not only to PSF, but also to other companies as well. Brookside also provided benefits to its employees separate and apart from those benefits that PSF offered to Brookside and its employees. For these reasons, Brookside is not an insider under § 548(a)(1)(B)(ii)(III).

At this point, the Court turns to whether the transfers made to Weeks were in the ordinary course of business. Because the Court determined above that Brookside was not an insider, the Court need not determine whether payments made to Brookside were made in the ordinary course of business.

MEMORANDUM OF DECISION − 40

There is very little case law examining the meaning of the term "ordinary course of business" under § 548(a)(1)(B)(ii)(III). However, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning. *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433, 52 S. Ct. 607, 609, 76 L. Ed. 1204 (1932). There is ample case law examining the term "ordinary course of business" for the purposes of § 547(c)(2)(A), which the Court walks through in depth below with respect to Plaintiff's § 547(c) defense. In short, the targeted payments must be "ordinary in relation to past practices between the debtor and [the] . . . creditor." *Mordy v. Chemcarb, Inc. (In re Food Catering & Hous., Inc.)*, 971 F.2d 396, 398 (9th Cir. 1992). Defendants must show a baseline of past practices between itself and the debtor, and that the targeted payments are ordinary in relation to those past practices. Often, creditors demonstrate this by showing the target payments did not differ in amount or form from past payments and were not the result of unusual collection or payment activities. *Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*, 504 F.3d 775, 790 (9th Cir. 2007).

The Court finds that, during the targeted transfer period, the two-year window preceding May 15, 2018, the payments to Weeks were made in the ordinary course of business. Plaintiff's Exhibit 112 details the payments made to Weeks beginning as far back as May 2014. There was a payment to Weeks in the amount of $8,333.32 in May 2014, and that amount continued monthly up until about April 2018.

MEMORANDUM OF DECISION − 41

There is no indication or evidence that Weeks was taking advantage of PSF's deteriorating financial condition. Payments to Weeks had begun years earlier, although Exhibit 112 only shows Weeks' payments back to May 2014. The sums paid to Weeks were the same before and after the lookback period began, and the amount was consistent throughout. Considering the totality of the circumstances, the Court finds and concludes that, during the relevant lookback period, the payments to Weeks were made in the ordinary course of business.

3.      *Conclusion regarding transfers alleged under § 548*

The Court finds that Plaintiff has not met its burden with respect to its claim of actual fraud under § 548(a)(1)(A) and this claim will be denied with respect to both Defendants.

Additionally, Plaintiff failed to satisfy its burden under § 548(a)(1)(B) with respect to Weeks because PSF received reasonably equivalent value in exchange for the transfers to that Defendant. Plaintiff's claim will be denied in its entirety with respect to Weeks for both actual fraud under § 548(a)(1)(A) and constructive fraud under § 548(a)(1)(B).

The Plaintiff has satisfied its burden under § 548(a)(1)(B), however, with respect to Brookside because PSF received less than reasonably equivalent value in exchange for some transfers, and PSF was insolvent at the time of some of the transfers. PSF only satisfied its burden, however, with respect to transfers made between the end of December 2016 and the petition date. Prior to that time period, PSF was not insolvent under a balance-sheet standard.

MEMORANDUM OF DECISION − 42

Moreover, during the relevant time period, Brookside was not an insider.[8]

Therefore, Plaintiff can recover $131,054.67, representing the transfers made to

Brookside between the end of December 2016 and May 15, 2018,[9] because PSF received

less than reasonably equivalent value in exchange for the transfers and PSF was insolvent

at the time. In addition, PSF Plaintiff can recover $2,332 for transfers that were

reimbursements to Brookside for services it provided to Idaho Springs Water Company.

Plaintiff will be allowed to recover $133,386.67 in total pursuant to § 550(a).[10]

4.    *Idaho Code §§ 55-913 and 55-914*

Under § 544(b)(1), a trustee may "avoid any transfer of an interest of the debtor in

property . . . that is voidable under applicable law by a creditor holding an unsecured

claim . . . ." *Hillen v. City of Many Trees LLC, et al. (In re CVAH, Inc.)*, 570 B.R. 816,

---

[8] All elements of § 548(a)(1)(B)(ii)(III) must be proven to prevail on a constructive fraud claim. Plaintiff has failed to prove that payments to Weeks were not made in the ordinary course of business, and has also failed to prove that Brookside was an insider. Because Plaintiff has failed to prove at least one of the elements of the constructive fraud claim with respect to Weeks and Brookside, it does not matter then whether the transfers were made under an employment contract or not.

[9] *See* Ex. 112A for the detailed transaction history.

[10] Section 550(a) provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]

§ 550(a).

MEMORANDUM OF DECISION − 43

823 (Bankr. D. Idaho 2017) (quoting § 544(b)(1)). This Court discussed this Code

provision in *In re CVAH*:

> To define the scope of a trustee's § 544(b)(1) avoiding powers, then, it is
> necessary to understand the Code's use of the term "applicable law." In this
> Court's experience, bankruptcy trustees in this District generally rely on
> Idaho's fraudulent transfer laws as the "applicable law" when seeking to
> recover fraudulent transfers avoidable by existing creditors under
> § 544(b)(1). They invoke § 544(b)(1) because the Idaho statutes target
> transfers made within four years of bankruptcy, rather than the two-year
> look-back period provided in § 548(a)(1).

*Id*. *See also* Idaho Code § 55-918.

The analysis regarding transfers, reasonably equivalent value, and insolvency

under Idaho Code §§ 55-913 and 914 is the same as § 548,[11] except the duration of the

look-back period is four-years rather than the two-years under § 548.

Before reaching the merits, however, there is one prerequisite Plaintiff must meet

in order to invoke § 544(b). Section 544(b) provides that a trustee can avoid any transfer

that is voidable under applicable law by a creditor holding an allowed unsecured claim.

*In re CVAH, Inc.*, 570 B.R. at 825. Thus, there must be a creditor who existed at the time

of the transfer. *See Decker v. Tramiel (In re JTS Corp.)*, 617 F.3d 1102, 1113 (9th Cir.

2010) (holding that "the existence of a § 544(b) claim requires only that one creditor exist

at the time that the transfer was made and that that creditor have an actionable claim

against the estate."). The trustee steps into the creditor's shoes to avoid the transfer under

---

[11] Idaho Code § 55-913 is Idaho's equivalent of § 548(a)(1)(A), and Idaho Code § 55-914 is Idaho's
equivalent of 548(a)(1)(B).

MEMORANDUM OF DECISION − 44

the applicable law. *Id*. (citing *Mukamal v. Kipnis (In re Kipnis)*, 555 B.R. 877, 882

(Bankr. S.D. Fla. 2016; *Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 711 (Bankr. N.D.

Ill. 2014)).

The trustee's powers under § 544(b) require pleading and proof of the existence of

such an unsecured creditor, as well as a showing that applicable state law grants that

creditor the right to avoid the transfer. *Crawforth v. Bachman (In re Bachman)*, No. 05-

05596-JDP, 2007 WL 4355620, at *13 (Bankr. D. Idaho Dec. 10, 2007) (citing *Elsaesser*

*v. Raeon (In re Goldberg)*, 99.2 I.B.C.R. 62, 65 (Bankr. D. Idaho 1999)).

As such, this Court does not assume that an unsecured creditor existed at the time

the transfers took place that could avoid the transfers and into whose shoes the Plaintiff

now may step to avoid the transfers. This Court, rather, requires actual pleading and

proof of the existence of such a creditor. *See In re All Terrain, LLC*, 625 B.R. 462, 481–

82 (Bankr. D. Idaho 2020) (holding that, because the trustee did not provide the requisite

pleading and proof of an unsecured creditor that existed at the time of the transfers in

question, the trustee's § 544(b) cause of action, and necessarily his state law causes of

action under Idaho Code §§ 55-913 and 914, must be denied).

Plaintiff's § 544(b) cause of action in this case suffers from the same fatal flaw as

occurred in *In re All Terrain*: there is no pleading or proof of the existence of an

unsecured creditor who existed at the time of the transfers in question who could avoid

the transfer. This is a requirement of § 544(b), and the Court cannot overlook the flaw in

MEMORANDUM OF DECISION − 45

Plaintiff's pleading and proof. Plaintiff's § 544(b) cause of action, as well as its causes of action under Idaho Code §§ 55-914 and 914, will be denied.

B.    Section 547(b) Causes of Action and § 547(c) Defenses

Plaintiff argues that certain transfers from PSF to Defendants are avoidable under § 547(b), but Defendants argue that several § 547(c) defenses are applicable under the facts presented here, such that Plaintiff's § 547(b) claim should be denied.

1.    *Section 547(b)*

Plaintiff argues that $35,304.21 transferred to Defendants within ninety days before the petition date constitutes an avoidable preference transfer under § 547(b), which provides that a trustee avoid any transfer of an interest of the debtor in property:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made--
>> (A) on or within 90 days before the date of the filing of the petition; or
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if--
>> (A) the case were a case under chapter 7 of this title;
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

§ 547(b). Plaintiff bears the burden of proving these elements, while Defendants bear the burden of proving the targeted transfers are excepted from avoidance under § 547(c).

§ 547(g); *Gugino v. Credit Acceptance Corp. (In re Conklin)*, 511 B.R. 688, 692 (Bankr. D. Idaho 2014).

MEMORANDUM OF DECISION − 46

A debt is an 'antecedent debt' if it was created before the transfer occurred."

*Rainsdon v. Am. First Fed. Credit Union (In re Power)*, No. 16-40636-JDP, 2017 WL

4158329, at *4 (Bankr. D. Idaho Sept. 18, 2017) (citing *Rainsdon v. Farson (In re*

*Farson)*, 387 B.R. 784 (Bankr. D. Idaho 2008)). "A debt is incurred when the debtor first

becomes legally bound to pay." *Krommenhoek v. Est. of Pfankuch Food Serv.'s, Inc. (In*

*re Pfankuch)*, 393 B.R. 18, 26 (Bankr. D. Idaho 2008) (quoting *Matter of CHG Int'l, Inc.*,

897 F.2d 1479, 1486 (9th Cir. 1990), *abrogated on other grounds by Union Bank v.*

*Wolas*, 502 U.S. 151, 112 S. Ct. 527, 116 L. Ed. 2d 514 (1991)). In other words, "[a] debt

is antecedent if it is incurred before the transfer in question." *Hymas v. Am. Gen. Fin.,*

*Inc.* (*In re Blair)*, Nos. 98-40631, 99-6016, 2000 Bankr. Lexis 2115, at *24–26 (Bankr.

D. Idaho May 18, 2000) (citing 5 COLLIER ON BANKRUPTCY, P 547.03[4] (Matthew

Bender 15th Ed. Revised 2000)).

Here the proof of whether the monthly fee payments paid to the Defendants were

connected to an antecedent debt is lacking. There was scant proof of the timing of when

the monthly payable to Weeks was incurred and when the monthly fees were transferred

to Defendants. The Court will not speculate to determine whether the debt was incurred

before or after the transfers in question. Thus, the Court concludes that the Plaintiff failed

to prove this element of § 547(b) concerning the monthly fee payments. There were no

reimbursements for costs or equipment during the relevant lookback period of ninety

days prepetition. Ex. 111. As discussed below, moreover, Plaintiff raises valid defenses

MEMORANDUM OF DECISION – 47

to Plaintiff's cause of action, so the Court will examine the remaining elements of

§ 547(b).

"Under § 547(f), a debtor is presumed to be insolvent on and during the 90 days

immediately preceding the petition filing date." *Rainsdon v. Am. First Fed. Credit Union*

*(In re Power)*, 2017 WL 4158329, at *3.[12]

"Section 547(b)(5) 'constitutes the so-called "greater amount test," which requires

the court to construct a hypothetical chapter 7 case, and determine what the creditor

would have received if the case had proceeded under chapter 7 without the alleged

preferential transfer.'" *Rainsdon v. Am. First Fed. Credit Union (In re Power)*, 2017 WL

4158329, at *5 (quoting *Schoenmann v. Bank of the West (In re Tenderloin Health)*, 849

F.3d 1231, 1235 (9th Cir. 2017)). "[A]s long as the distribution in [the bankruptcy case]

is less than one-hundred percent, any payment 'on account' to an unsecured creditor

during the preference period will enable that creditor to receive more than he would have

received in liquidation had the payment not been made." *Id*. (quoting *Elliott v. Frontier*

---

[12] As stated in Section (A)(2)(c)(2) above, Weeks was a non-statutory insider of PSF under § 101(31)(B). That finding would change the applicable look-back period. § 547(b)(4). Plaintiff, however, only seeks to recover transfers that occurred within ninety days of the bankruptcy. *See* Plaintiff's Complaint, Dkt. No. 1, ¶ 33; *see also* Plaintiff's Prayer for Relief in Plaintiff's Complaint, Dkt. No. 1, p. 10 (seeking to recover transfers made after February 14, 2018, which is ninety days before PSF filed its petition); *see also* Plaintiff's Pre-trial Memorandum, Dkt. No. 35, p. 34 (arguing that transfers made within ninety days of the bankruptcy filing should be avoided pursuant to § 547(b), but making no argument with respect to those transfers made between ninety days and one year before the bankruptcy petition was filed). The Court, therefore, will not consider any transfers that may have occurred between ninety days and one year before the petition was filed with respect to Plaintiff's § 547(b) claim.

MEMORANDUM OF DECISION − 48

*Props. (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1421 (9th Cir. 1985) (emphasis in original)).

The transfers in question were made to creditors, Weeks and Brookside. Not only is PSF presumed to be insolvent during the ninety days preceding its petition filing date, a presumption which was never rebutted by Defendants, but, as stated above, the Court heard expert testimony that, at best, PSF was insolvent no later than the last quarter of 2016. Here, PSF commenced its bankruptcy on May 15, 2018. Thus, at all relevant times, PSF was insolvent at the time of the transfers Plaintiff seeks to avoid. Finally, the Plan Administrator, testifying as an expert witness, testified that the transfers in question enabled Defendants to receive more than they would have received under a chapter 7 bankruptcy. Moreover, he testified that the transfers enabled Defendants to receive more than they would have received had the transfers not been made. Defendants did not rebut this testimony.

Plaintiff failed to satisfy its burden proving that the monthly fee payments were made on account of an antecedent debt, and no transfers for costs or equipment were made within ninety days of the petition. Nonetheless, because there are valid defenses raised, the Court will address the monthly fee payment transfers with respect to Defendants' § 547(c) defenses. Defendants bear the burden to prove the targeted transfers are excepted from avoidance under § 547(c).

MEMORANDUM OF DECISION − 49

2.      *Section 547(c) Defenses*

Defendants argue that Plaintiff cannot avoid the transfers pursuant to the defenses

enumerated in § 547(c). *See* Defendants' Affirmative Defenses raised in their Answer,

Dkt. No. 4, p. 4; Defendants' Pre-Trial Memorandum, Dkt. No. 39, p. 6. Defendants bear

the burden of proving the transfers are excepted from avoidance under § 547(c). *Gugino*

*v. Credit Acceptance Corp. (In re Conklin)*, 511 B.R. at 692.

a.      *Section 547(c)(2)*

Section 547(c)(2) provides that Plaintiff may not avoid a transfer under § 547(b):

> (2) to the extent that such transfer was in payment of a debt incurred by the
> debtor in the ordinary course of business or financial affairs of the debtor
> and the transferee, and such transfer was--
>> (A) made in the ordinary course of business or financial affairs of
>> the debtor and the transferee; or
>> (B) made according to ordinary business terms[.]

§ 547(c)(2).[13]

In short, preference payments that were made in the ordinary course of business

should not be avoided. *Sigma Micro Corp. v. Healthcentral.com (In re*

*Healthcentral.com)*, 504 F.3d at 789–90 (citing 5 COLLIER ON BANKRUPTCY

¶ 547.04[2][a], 547–55 (rev. 15th ed. 2006)). The purpose of this defense is to preclude

avoidance of transfers that were made pursuant to normal financial relations, because

---

[13] In 2005 Congress amended § 547(c)(2), which renumbered some of the subparagraphs. Therefore, some
of the case law to which this Court has cited might refer to different subparagraphs than case law that was
decided before those amendments. The Court has parenthetically inserted the current statute into the
quotes.

MEMORANDUM OF DECISION − 50

such transfers do not contradict the general policy of the preference section which is to

discourage abnormal behavior by the debtor and creditors during the debtor's slide into

bankruptcy. 5 COLLIER ON BANKRUPTCY ¶ 547.04[2][a], 547–55 (rev. 15th ed. 2006)

(citing H.R. Rep. No. 595, at 373–74 (1997), reprinted in 1978 U.S.C.C.A.N. 5787,

6329)).

(1)      Section 547(c)(2)(A): Ordinary Course of Business

To satisfy § 547(c)(2)(A), the creditor must demonstrate that the relevant

payments were "ordinary in relation to past practices between the debtor and [the] . . .

creditor." *Mordy v. Chemcarb, Inc. (In re Food Catering & Hous., Inc.)*, 971 F.2d at 398.

This can be broken down as follows:

> First, the creditor must show a baseline of past practices between itself and
> the debtor. Second the creditor must show that the relevant payments were
> ordinary in relation to these past practices. This is most commonly done by
> demonstrating that the relevant payments did not differ from past payments
> in "amount" or "form," were not the result of unusual collection or payment
> activities, or did not come as a result of the creditor taking advantage of the
> debtor's deteriorating financial condition.

*Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*, 504 F.3d at 790

(cleaned up). Although non-exclusive, there are several factors this Court can consider in

determining whether transfers are ordinary in relation to past practices:

> 1) the length of time the parties were engaged in the transactions at issue; 2)
> whether the amount or form of tender differed from past practices; 3)
> whether the debtor or creditor engaged in any unusual collection or
> payment activity; and, 4) whether the creditor took advantage of the
> debtor's deteriorating financial condition.

*Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 732 (9th Cir. 1994).

MEMORANDUM OF DECISION – 51

The Court finds that Defendants have met their burden with respect to their § 547(c)(2)(A) defense and the monthly fee payments to Brookside and Weeks. The Court has little doubt that there is a baseline of past practices between PSF and both Defendants in this case. Weeks had worked for PSF for many years before the time period at issue here, and received roughly the same pay the entire time. Brookside had been receiving payments for approximately three years before the petition was filed. These payments to Weeks and Brookside were made on a monthly basis for approximately six and three years, respectively. These are not insignificant periods of time. Moreover, the payments had also been made for a long period of time before December 2016, the timeframe that PSF became insolvent. The amount and form of the transfers were likewise consistent throughout the entire time period with few exceptions. Finally, there is no evidence that Defendants took advantage of PSF's deteriorating financial condition; the payments both before and after insolvency remained consistent. Plaintiff's § 547(b) claim for monthly fee payments to Defendants, accordingly, will be denied.

### 3.    *Conclusion regarding the 547 transfers*

Plaintiff failed to satisfy its burden of proving that the monthly fee payments were made on account of an antecedent debt. Defendants also satisfied their burden in proving that the monthly fee payments were made in the ordinary course of business. Finally, no transfers were made for reimbursement of expenses during the relevant lookback period. The Court does not find it necessary to, and thus will not, address Defendants' other

§ 547(c) defenses. Plaintiff's § 547 claim will be denied in its entirety with respect to both Defendants.

C.      Section 549 and Section 550(a)

Plaintiff next argues that transfers in the amount of $141,087.23 are avoidable as unauthorized postpetition transfers pursuant to § 549, which provides that the trustee may avoid a transfer of property of the estate that occurs after the commencement of the case that is authorized only under §§ 303(f) or 542(c) or that was not authorized by Code or by the Court.

In a § 549 avoidance action, "the trustee bears the burden of proving that a postpetition transfer of estate property occurred, but the burden of proof as to the validity of the postpetition transfer is on the transferee." *Rainsdon v. Davisco Foods Int'l, Inc. (In re Azevedo)*, 497 B.R. 590, 595 (Bankr. D. Idaho 2013); *see also* Rule 6001. To recover under § 549, Plaintiff must prove "a transfer (1) of estate property; (2) that occurred after the commencement of the case; and (3) that was not authorized by statute or the court." *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 728 (9th Cir. BAP 2008).

The parties do not dispute that postpetition transfer of estate property occurred. Rather, it appears to the Court that Defendants' argument is two-fold. First, they argue that the postpetition transfers were, in essence, authorized by the Code. More to the point, Defendants argue that Defendants were not professionals and thus, Court approval was not required before employing them. Second, Defendants contend that the Court did in

MEMORANDUM OF DECISION – 53

fact authorize their employment through the cash collateral orders this Court entered.

Defendants argue that there were line-items on those cash-collateral orders entitled

"labor" and "contract services," and it was those line-items that provided for expenses to

be paid out to Weeks and Brookside.

Generally speaking, estate professionals must have their employment approved by

the bankruptcy court in advance of performing any compensable services:

> [a] trustee [or debtor in possession], with the court's approval, may employ
> one or more attorneys, accountants, appraisers, auctioneers, or other
> professional persons, that do not hold or represent an interest adverse to the
> estate, and that are disinterested persons, to represent or assist the trustee in
> carrying out the trustee's duties under this title.

§ 327(a) (*see also In re Walker Land & Cattle, LLC*, 535 B.R. 348, 351 (Bankr. D. Idaho

2015) (explaining that § 1107(a) grants a chapter 11 debtor in possession the rights and

powers of a trustee, including employment of estate professionals).[14]

There is very little argument by Plaintiff that Weeks or Brookside were

professionals, other than conclusory statements. Professionals employed pursuant to

§ 327 are fiduciaries of the estate and are employed only to represent the estate's best

interest, as opposed to the interest of the debtor. *Mccutchen, Doyle, Brown & Enersen v.*

---

[14] Although bankruptcy courts possess the equitable power to approve retroactively compensation for valuable, but unauthorized, services of a professional, the Court's power to grant this relief is limited to situations where "exceptional circumstances" exist. *Sherman v. Harbin (In re Harbin)*, 486 F.3d 510, 522 (9th Cir. 2007) (citing *Okamoto v. THC Fin. Corp. (In re THC Fin. Corp.)*, 837 F.2d 389, 392 (9th Cir. 1988). To establish exceptional circumstances, professionals seeking retroactive approval must (1) satisfactorily explain their failure to receive prior judicial approval; and (2) demonstrate that their services benefitted the bankrupt estate in a significant manner. *Law Off.'s of Halperin v. Occidental Fin. Group, Inc. (In re Occidental Fin. Group, Inc.)*, 40 F.3d 1059,1062 (9th Cir. 1994). Because Defendants have not argued in support of such relief, the Court will not consider the argument.

MEMORANDUM OF DECISION – 54

*Off. Comm. of Unsecured Creditors (In re Weibel, Inc.)*, 176 B.R. 209, 212 (9th Cir. BAP 1994). There is very little case law informing this Court how to determine whether a person is a "professional" for the purposes of § 327, and the Code does not define the term. Other courts have held that "a 'professional' is limited to those occupations which control, purchase or sell assets that are important to reorganization, is negotiating the terms of a plan of reorganization, [and] has discretion to exercise his or her own personal judgment. . . ." *In re Heritage Home Grp. LLC*, No. 18-11736 (KG), 2018 WL 4684802 (Bankr. D. Del. Sept. 27, 2018) (citing *In re First Merch.'s Acceptance Corp.*, 1997 WL 873551 at *3 (D. Del. Dec. 15, 1997)).

In essence, a professional is a person whose occupation plays a central role in the administration of the bankruptcy case. *In re Rusty Jones, Inc.*, 109 B.R. 838, 843 (Bankr. N.D. Ill. 1989). The determination of whether a person is a professional for the purpose of § 327 is made on a case-by-case basis. *In re Madison Mgmt. Grp., Inc.*, 137 B.R. 275, 283 (Bankr. N.D. Ill.1992) "Form is not determinative. The bankruptcy court should consider the substance of the person's employment over the form in determining whether the person is a professional. . . ." *Id.* The district court for the Northern District of Illinois has provided fairly descriptive guidance:

> A "professional" has been defined as an employee that performs non-repetitive tasks involving the "exercise of judgment and discretion" in order to assure the company's future viability, such as development of a business plan, assistance and supervision of bookkeeping and financial functions relating to receivable collections, lease negotiations, disposal of nonessential assets, and supervision of personnel. Those tasks touch the full range of the debtor's present and future operations, the administration of its bankruptcy, the marshalling and disposition of its assets, its personnel, and

MEMORANDUM OF DECISION – 55

its finances. It is difficult to envision a more expansive role in the administration of the bankruptcy case.

*In re Renaissance Residential of Countryside, LLC*, 423 B.R. 848, 856–57 (Bankr. N.D. Ill. 2010) (cleaned up). In addition, Courts have considered the following factors in making the determination of whether an employee is a "professional" within the meaning of § 327:

> (1) whether the employee controls, manages, administers, invests, purchases or sells assets that are significant to the debtor's reorganization, (2) whether the employee is involved in negotiating the terms of a Plan of Reorganization, (3) whether the employment is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations, (4) whether the employee is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate, (5) the extent of the employee's involvement in the administration of the debtor's estate, and (6) whether the employee's services involve some degree of special knowledge or skill, such that the employee can be considered a "professional" within the ordinary meaning of the term.

*Id.* (citing *In re Am. Tissue, Inc.*, 331 B.R. 169, 173 (Bankr. D. Del. 2005); *In re First Merch.'s Acceptance Corp.*, 1997 WL 873551, at *3).

   Although there may be some evidence indicating otherwise, the Court finds that neither Weeks nor Brookside are professionals under § 327. For example, Weeks might have managed PSF systems, but he did so at Mr. Parkinson's direction. Neither Weeks nor Brookside hold any professional certifications, nor did Defendants employ any sort of professional skills on behalf of PSF.[15] Neither Weeks nor Brookside exercised any

---

[15] Ironically, this fact helps Defendants with respect to this cause of action but cuts against them with respect to the reasonably equivalent value argument above under § 548. The crux of Plaintiff's § 548

MEMORANDUM OF DECISION − 56

discretion or personal judgment in the administration of PSF's estate post-petition. In fact, they were under much scrutiny after the petition was filed. Because the Court finds that Weeks and Brookside are not professionals under § 327, they did not need Court approval to complete services on behalf of PSF.

Moreover, the Court finds that payment for Weeks' services were provided for in the Court's postpetition order approving Debtor's use of cash collateral. Ex. 203. That order approved the cash collateral budget that was approved by the creditors that held a lien in the cash collateral. Ex. 202. Attached to the motion was the budget that this Court approved. That budget provided a line item entitled "Contract Services." Weeks testified that the amount allocated to "Contract Services" was the amount being paid to Weeks for his postpetition services. Weeks testified that he was present when these budgets were discussed with interested parties, and the Court finds his testimony credible. Plus, the amount being paid to Weeks matches up perfectly with the line item for "Contract Services."

Virtually every check issued to Weeks during this relevant time period was for $6,000.[16] The Court finds credible Weeks' testimony that the line item "Contract Services" included services provided by Weeks. Therefore, the fact that PSF was paying

---

argument is that it did not receive reasonably equivalent value to what it gave up because the services it received was not worth the value it gave up. Arguing here that Defendants were professionals cuts against Plaintiff's § 548 argument above. It seems Plaintiff wants to have it both ways.

[16] The check issued to Weeks in August 2018 was for $6,000.60, and the check issued to Weeks in July 2019, the month Weeks quit working for PSF, was $ 1,940.73. Ex. 114.

MEMORANDUM OF DECISION – 57

$6,000 a month for Contract Services was disclosed and the Court approved the use of cash collateral based on the budget and the other terms of the Stipulation.

With respect to Brookside, it received two $6,000 checks in June 2018, and one in July 2018. It then also received a $6,000 check in November 2018, and again in January 2019. In all months that Brookside received a $6,000 check, Weeks did not receive one. It appears PSF issued those monthly checks to Brookside instead of Weeks mistakenly.

The Court finds, however, that payments to Brookside were not authorized by this Court in the cash collateral orders. PSF transferred $79,145.97 to Brookside postpetition. Ex. 114. Brookside was not paid out of Contract Services other than when it received a $6,000 check instead of Weeks. Brookside, according to Weeks' testimony, was paid out of the Labor General, Labor Other, or Office and Telephone expense account. There is no evidence, however, that the Brookside postpetition fees were discussed as part of the cash collateral budget hearings, nor which line item Brookside was to be paid from. While the exhibits demonstrate which accounts the money came from, there is no evidence that, before the cash collateral budget was approved, the parties understood that Brookside was supposed to be paid from a specific expense account. Moreover, Weeks testified that Brookside did not do any mapping after the petition had been filed, and essentially performed the same work that Weeks was performing for the company. As stated above, Defendants have the burden of proving the validity of the postpetition transfers, and Brookside has failed to sustain that burden here.

MEMORANDUM OF DECISION – 58

Weeks has satisfied his burden in proving the validity of the postpetition transfers, and therefore Plaintiff's § 549 claim will be denied with respect to Weeks. Brookside has failed to sustain its burden, however. Accordingly, Plaintiff's § 549 claim will be granted with respect to Brookside in the amount of $79,145.97. Because Brookside is the initial transferee of an avoidable transfer, Plaintiff will be allowed to recover this amount pursuant to § 550(a).

D.    Fraud

Next, Plaintiff argues that it can recover certain transfers under a state law claim for fraud. Plaintiff must establish nine elements to prevail on its fraud claim:

> (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury.

*Glaze v. Deffenbaugh*, 144 Idaho 829, 833, 172 P.3d 1104, 1108 (2007) (quoting *Mannos v. Moss*, 143 Idaho 927, 931, 155 P.3d 1166, 1170 (2007)).[17] These elements must be

---

[17] Plaintiff also argues that Defendants' conduct was constructively fraudulent. An action for constructive fraud lies when there has been a breach of a duty arising from a relationship of trust and confidence, as in a fiduciary duty. *Hines v. Hines*, 129 Idaho 847, 853, 934 P.2d 20, 26 (1997); *see also Mitchell v. Barendregt*, 120 Idaho 837, 844, 820 P.2d 707, 714 (Ct. App. 1991). For the reasons specified in Section G below, Defendants owed Plaintiff fiduciary duties. A party must traditionally establish nine elements to prove actual fraud. If a plaintiff establishes that there has been a breach of duty arising from a relationship of trust and confidence, of those nine elements for actual fraud, a claim of constructive fraud does not require proof of (1) the speaker's knowledge of the falsity regarding the statement or representation of fact, or (2) the speaker's intent that the hearer rely on the statement or representation of fact. *Country Cove Dev., Inc. v. May*, 143 Idaho 595, 601, 150 P.3d 288, 294 (2006). The plaintiff is still required to prove the remaining seven elements of actual fraud. *Gray v. Tri-Way Const. Servs., Inc.*, 147 Idaho 378, 386, 210 P.3d 63, 71 (2009). Idaho case law, however, treats constructive fraud as a synonym for breach of a fiduciary duty. *See Country Cove*, 143 Idaho at 601, 150 P.3d at 294 (citing *McGhee v. McGhee*, 82 Idaho 367, 371, 353 P.2d 760, 762 (1960)). For the reasons set forth in Section G below, Defendants did not breach any fiduciary duty owed to Plaintiff. Moreover, to prevail on a constructive fraud claim,

MEMORANDUM OF DECISION − 59

proven by clear and convincing evidence. *Doe v. Boy Scouts of Am.*, 159 Idaho 103, 108,

356 P.3d 1049, 1054 (2015). The Court will consider each element.

    *1.    Representation or Omission*

    Plaintiff alleges that Defendants made statements to PSF and to KeyBank that

payments made to Brookside between 2014 and 2018, totaling $303,097, were payments

that were PSF-related when, in fact, they were not. Instead, Plaintiff argues that the

payments to Brookside were actually payments made to build up Weeks' retirement

rather than for services rendered to PSF. Although not pled in the complaint, Plaintiff

identifies the following statements or omissions in its pre-trial brief:

> [1] The false representations to PSF in the QuickBooks and, by extension,
> to KeyBank and other creditors that Brookside was providing value to PSF
> such that PSF was obligated to pay it significant monthly fees ($8,000) and
> significant reimbursement amounts, even though it was, in reality, solely a
> vehicle for Weeks' retirement;
> [2] The false representations to PSF in the QuickBooks and, by extension to
> KeyBank and other creditors that reimbursement payments to Brookside
> and Weeks were for PSF expenses, when in reality they were Brookside
> expenses;
> [3] The false representations to PSF in the QuickBooks and, by extension to
> KeyBank and other creditors that reimbursement payments to Brookside
> and Weeks were for PSF expenses, when in reality they were for Idaho
> Springs Water Company expenses;
> [4] The false representations to PSF that Weeks was providing value and
> management services to PSF and looking after PSF's best financial interests
> when, in reality, Weeks was actively defrauding the company by funding
> the growth of Brookside, his retirement business; and

---

Plaintiff is only absolved from proving knowledge and intent if there was a breach of a fiduciary duty
which, again, did not occur here. Therefore, the Court will not consider Plaintiff's constructive fraud
claim and Plaintiff is required to prove all nine elements of its actual fraud claim, including knowledge
and intent.

MEMORANDUM OF DECISION – 60

[5] The false representations to the court, the trustee, and the plan administrator regarding the true nature of the payments discussed above.

Dkt. No. 35, p. 36.

First, it is not entirely clear to the Court that Defendants themselves made any statements to KeyBank whatsoever, nor is it clear how statements made to KeyBank equate to statements made to Plaintiff. KeyBank is not a Plaintiff. Apparently, Plaintiff alleges that Defendants made certain statements to PSF, who then passed those statements along to KeyBank, and those statements that were relayed to KeyBank support PSF's claim for fraud. This argument cannot hold water. Statements made by Mr. Parkinson or PSF to KeyBank do not equate to statements made by Weeks or Brookside, and KeyBank is not a named plaintiff in this case. Furthermore, it has not identified particular statements that Defendants made to the court, trustee, or the Plan Administrator which give rise to its fraud claim, and it is inappropriate for the Court to engage in supposition.

Second, looking at Exhibits 101–103, it is clear that Weeks was interested in setting up some type of company in which he could build equity. Exhibit 103 makes it clear, however, that the company Weeks started to enable him to build equity would also provide services to PSF. Exhibit 103, the final letter from Weeks to Mr. Parkinson discussing the possibility of Weeks forming some sort of business, is the only letter that explicitly mentions Brookside, and Brookside was formed shortly after this letter was sent. So, while Plaintiff alleges that Weeks and Brookside made statements to PSF that any funds would be used solely for PSF purposes, it must also be noted that, in context,

MEMORANDUM OF DECISION – 61

Weeks disclosed that the company he founded would both provide services to PSF and build equity for Weeks' retirement.

2.    *Falsity*

Plaintiff argues that the representations to PSF that payments to Brookside were PSF-related were false because, in reality they were being used "solely" to build Weeks' retirement portfolio.

The Court disagrees with Plaintiff's argument that all of the statements or representations were false. The money that PSF paid to Defendants was not used "solely" to fund Weeks' retirement. Rather, Weeks and Brookside both provided services to PSF. Brookside employed several people who worked on projects for PSF and also provided mapping and GIS services to PSF. Exhibit 103, again, explicitly mentions Brookside, and states both that Weeks was interested in getting some type of company started that could help build his equity over time for his retirement, and that Brookside would offer services to PSF. So, while Plaintiff may believe that the services offered were disproportional to the fee amounts being paid, the Court does not find these statements to be false. Exhibit 103 explicitly states that Brookside would be both part of Weeks' retirement plan as well as a company that offers services to PSF, which is what actually occurred. Moreover, the letter expressly acknowledges that Brookside would need more financial nurturing during its first few years in operation.

In addition, although Plaintiff claims that there were false representations to PSF that Weeks was providing value and management services to PSF and looking after

MEMORANDUM OF DECISION – 62

PSF's best financial interests when, in reality, Weeks was actively defrauding the company by funding the growth of Brookside, his retirement business. Plaintiff, however, did not specify any particular statements that were false. Furthermore, Weeks never hid the fact that Brookside would serve multiple purposes, including providing services to PSF while also being a company that would be his "retirement business."

Plaintiff also fails to specify particular false representations to PSF that reimbursement payments to Brookside and Weeks were for PSF expenses, when in reality they were Brookside expenses. In short, Plaintiff's claim lacks specificity. Additionally, while PSF did pay for some of the mapping equipment which was retained and owned by Brookside, Plaintiff identifies no false statement to PSF supporting this claim. There have been no statements identified that Brookside made to PSF concerning who would own the equipment after the purchase. It could very well be that Mr. Parkinson, and by extension PSF, knew that PSF would fund the purchase of the mapping equipment but Brookside would be the owner. The Court declines to speculate about which statements were false and might support a claim for fraud. It is Plaintiff's burden to prove these elements by clear and convincing evidence and it has not done so.

For these reasons, the Court finds that Plaintiff has failed to sustain its burden by clear and convincing evidence that the statements enumerated above as [1], [2], [4], and [5] were false at the time they were made. Plaintiff has met its burden on this element with respect to statement [3] because Weeks admitted that PSF should not have reimbursed Brookside for services Brookside provided to Idaho Springs Water Company,

MEMORANDUM OF DECISION – 63

yet the QuickBooks records indicate that those reimbursements were made because Brookside had performed services for PSF when in fact it had not.

### 3. Materiality

"Materiality refers to the importance of the misrepresentation in determining the plaintiff's course of action." *Watts v. Krebs*, 131 Idaho 616, 619, 962 P.2d 387, 390 (1998) (quoting *G & M Farms v. Funk Irrigation Co.*, 119 Idaho 514, 521, 808 P.2d 851, 858 (1991)). A representation is material if:

> (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or
> (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.

*Edmark Motors, Inc. v. Twin Cities Toyota*, 111 Idaho 846, 727 P.2d 1274 (Ct. App. 1986)) (citing *Watts v. Krebs*, 131 Idaho at 619–20, 962 P.2d at 390–91 (citing Restatement (Second) Of Torts § 538(2) (1977))). The Idaho Supreme Court recently held that statements were material where they "drove and dictated" the aggrieved party's actions. *Choice Feed, Inc. v. Montierth*, 481 P.3d 78, 96 (Idaho 2021).

The Court finds that statement [3], the lone remaining statement, is material. PSF reimbursed Brookside for expenses incurred for services provided solely to Idaho Springs Water Company. Armed with knowledge that PSF received no services in return for its payment to reimburse Brookside, and that Brookside incurred those expenses while providing services to Idaho Springs Water Company, a reasonable person in PSF's shoes

MEMORANDUM OF DECISION – 64

would not reimburse Brookside.

4.      *Speaker's knowledge of the falsity*

Weeks admitted that Brookside should not have been reimbursed with PSF funds for expenses incurred for services to Idaho Springs Water Company. But the pertinent question here is whether Weeks or Brookside knew at the time the representations were made that the statements were false. Weeks was charged with inputting information into QuickBooks for PSF and issuing reimbursements to third parties, one of which was Brookside. Weeks was also in charge of Brookside. Brookside performed services for Idaho Springs Water Company at the same time it performed services for PSF. Weeks, as the owner of Brookside, was aware of the work that it was performing for different customers, and Brookside is the company that actually performed the services. Thus, Defendants knew at the time Brookside asked PSF to reimburse it for expenses incurred servicing Idaho Springs Water Company that these representations were false.

5.      *Intent that PSF Rely or Act on the Statement*

A person intends that the another rely on a misrepresentation "if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct." Restatement (Second) of Torts § 531 cmt. c (1977). Weeks or Brookside intended that Brookside be reimbursed for the expenses. By stating that certain expenses were reimbursable to Brookside, the intent was to cause PSF to reimburse Brookside for those expenses.

MEMORANDUM OF DECISION – 65

### 6.     *Hearer's ignorance of the representation's falsity*

PSF is uniquely situated. Mr. Parkinson controlled PSF, and through his control as president he authorized the transfers in question to both Defendants. After this Court approved a proposed plan that appointed Mr. McKinlay as Plan Administrator, he investigated and initiated lawsuits on behalf of PSF, including the present case. Yet, PSF, the company that authorized the transfers by way of Mr. Parkinson, is the Plaintiff. Plaintiff now admits that Mr. Parkinson was in on Weeks' "scheme" to defraud PSF through numerous misrepresentations or omissions, and therefore also admits that Mr. Parkinson was not ignorant of the falsity of the statements which, as shown above, is a required element of a fraud claim. Plaintiff argues, however, that Mr. Parkinson's knowledge should not be imputed to PSF such that PSF cannot meet the ignorance and reliance elements. *See* Plaintiff's Pre-Trial Memorandum, Dkt. No. 35, p. 35–36. Defendants, not surprisingly, take the contrary position.

This issue has confronted other courts before this one. *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 457 (7th Cir. 1982) (applying a two-pronged analysis to determine whether such imputation should occur: whether a judgment in favor of the plaintiff corporation would properly compensate the victims of the wrongdoing, and whether such recovery would deter future wrongdoing); *Schacht v. Brown*, 711 F.2d 1343, 1348 (7th Cir. 1983) (distinguishing between cases like *Cenco* where the principals turn the company into an engine of theft and cases where fraud is committed against the corporation).

MEMORANDUM OF DECISION − 66

This Court can find no Ninth Circuit law on point, nor have the parties identified any. The Court, however, believes the issue can be resolved using basic tenets of principal-agent relationships. There is little doubt that, as president, Mr. Parkinson was PSF's agent.[18] In Idaho, the general rule is that knowledge of the agent is imputed onto the principal so long as the agent is not acting in an interest adverse to the principal. *Williams v. Cont'l Life & Acc. Co.*, 100 Idaho 71, 72–73, 593 P.2d 708, 709–10 (1979) (citing *Sulik v. Cent. Valley Farms, Inc.*, 95 Idaho 826, 838, 521 P.2d 144, 146 (1974)). If the agent is acting adversely to the principal's interest, then the agent's knowledge is not imputed.

The Restatements of Agency addresses this very issue:

> For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person. Nevertheless, notice is imputed
> >(a) when necessary to protect the rights of a third party who dealt with the principal in good faith; or
> >(b) when the principal has ratified or knowingly retained a benefit from the agent's action.
> A third party who deals with a principal through an agent, knowing or having reason to know that the agent acts adversely to the principal, does not deal in good faith for this purpose.

Restatement (Third) Of Agency § 5.04 (2006).

---

[18] Mr. Parkinson had the authority to alter legal relationships between PSF and third parties, he acted primarily for the principal's benefit in matters connected with the undertaking, and he exercised a great amount of control over the conduct of the PSF. *Nelson v. Kaufman*, 166 Idaho 270, 277, 458 P.3d 139, 146 (2020) (citing Restatement (Second) of Agency §§ 12–14); *see also* Section G below for an in depth discussion on principal-agent relationships.

MEMORANDUM OF DECISION – 67

First, the Court does not conclude that Mr. Parkinson was acting solely for his own or another's benefit when he approved the payments to Weeks and Brookside. Further, the rights of a third party are not at issue; rather, Plaintiff argues that PSF's rights are at issue, but PSF was the principal in the transaction. As stated above, Defendants provided services to PSF, a benefit that PSF retained for a lengthy amount of time, even if Plaintiff now argues that those services were not commensurate with the compensation it paid in exchange. Second, it is somewhat disingenuous for PSF to argue that Mr. Parkinson was acting adversely to the principal's interest. After all, Mr. Parkinson testified that he believed his money and PSF's money were one in the same, and Plaintiff argues this point in its pre-trial memorandum. It is doubtful that Mr. Parkinson, believing his money and PSF's money were one in the same, would act in a way adverse to PSF's interest. Finally, Mr. Parkinson's approval of payments to Weeks and Brookside were within his scope of powers as PSF's president or agent. Defendants' belief that Mr. Parkinson had the authority to authorize these transactions was reasonable under the circumstances presented here. For the aforementioned reasons, and with one exception, Mr. Parkinson's knowledge of the alleged misrepresentations is imputed to PSF. Plaintiff's fraud claim, accordingly, must be denied. However, although the Court concluded above that Plaintiff failed to sustain its burden in proving the falsity of statements listed as [1], [2], [4], and [5], and thus cannot recover under an action of fraud on the basis that those statements were false, the determination that Mr. Parkinson's knowledge is imputed to PSF only applies to those particular statements. With respect to statement [3] above, it is not clear

MEMORANDUM OF DECISION − 68

that Mr. Parkinson had any knowledge that PSF was reimbursing Weeks or Brookside for Idaho Springs Water Company expenses.

7.    *Reliance*

PSF clearly relied on the statement that it owed Brookside money for expenses because, based on the representations, PSF transferred funds to Brookside.

8.    *Justifiable Reliance*

"The recipient of a fraudulent misrepresentation of intention is justified in relying upon it if the existence of the intention is material and the recipient has reason to believe that it will be carried out." *Gray v. Tri-Way Const. Servs., Inc.*, 147 Idaho 378, 386, 210 P.3d 63, 71 (2009). "Whether the recipient has reason for this belief depends upon the circumstances under which the statement was made, including the fact that it was made for the purpose of inducing the recipient to act in reliance upon it and the form and manner in which it was expressed." *Id.* Put another way, whether a party is justified in its reliance depends upon the characteristics of the particular plaintiff as well as the facts and circumstances of each case.

In this case, PSF justifiably relied upon Weeks' or Brookside's representations that PSF owed Brookside money even though the expenses were actually incurred while providing services to Idaho Springs Water Company. PSF reimbursed Brookside numerous times after relying on the information provided by either Weeks or Brookside. Weeks input all information into QuickBooks and issued checks on behalf of PSF. Weeks had several years' experience in PSF's QuickBooks accounts and understood its finances,

MEMORANDUM OF DECISION – 69

and Weeks was ultimately in charge of PSF's QuickBooks. Thus, Plaintiff has satisfied this element with respect to statement [3].

      9.    *Proximate Injury*

"In order to secure relief on a basis of fraud, the party seeking redress must have been damaged, injured or harmed as a result of the asserted fraud. *Bryant Motors, Inc. v. Am. States Ins. Co.'s*, 118 Idaho 796, 800, 800 P.2d 683, 687 (Ct. App. 1990) (citing *Kloppenburg v. Mays*, 60 Idaho 19, 88 P.2d 513 (1939)). "Where injury is remote, contingent, and not necessarily a proximate result of the acts complained of, an action in fraud by a creditor against a person who fraudulently prevents him from collecting his claim may not be maintained." *Id.* (citing 37 AM. JUR. 2d Fraud and Deceit § 31, at 56 (1968)). Typically, the party seeking redress must prove both that the misrepresentations were the cause in fact of the resulting loss as well as the legal cause. Restatement (Second) of Torts § 548 (1977). "A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." Restatement (Second) of Torts § 548A (1977).

Here, the misrepresentation was both the cause in fact and legal cause of PSF's loss. The representation that PSF owed Brookside money for Idaho Springs Water Company expenses caused PSF to transfer funds to Brookside, and it is foreseeable that PSF would do so given the representation that PSF owed Brookside money.

MEMORANDUM OF DECISION − 70

### 10.     Conclusion on the Allegation of Fraud

Plaintiff has failed to sustain its burden with respect to the statements it identified to form the basis of its fraud claim, which are enumerated above as statements [1], [2], [4], and [5]. Plaintiff has successfully met its burden and proven all elements, however, with respect to statement [3]. PSF is entitled to recover $2,332 from Brookside for Idaho Springs Water Company expenses paid for by PSF.

### E.     Conversion of Funds

Plaintiff argues Defendants wrongfully converted $303,097, representing the fee payments to Brookside. Conversion is the act of wrongfully asserting dominion over another's personal property in denial of or inconsistent with the owner's rights therein. *Med. Recovery Servs., LLC v. Bonneville Billing & Collections, Inc.*, 157 Idaho 395, 401, 336 P.3d 802, 808 (2014) (citing *Carpenter v. Turrell*, 148 Idaho 645, 650, 227 P.3d 575, 580 (2010)).

Plaintiff must prove three elements to prevail on its conversion claim: (1) that Defendants wrongfully gained dominion of property; (2) that the property was owned or possessed by Plaintiff at the time Defendants gained dominion; and (3) the property in question is personal property. *Taylor v. McNichols*, 149 Idaho 826, 846, 243 P.3d 642, 662 (2010).

Here, Plaintiff argues that Defendants are liable for conversion for the misappropriation of money that came into their possession. "Conversion for misappropriation of money is normally not available as a cause of action unless the

MEMORANDUM OF DECISION − 71

money or funds can be described or identified as a specific chattel. *Warm Springs Prop., Inc. v. Andora Villa, Inc.*, 96 Idaho 270, 272, 526 P.2d 1106, 1108 (1974) (holding that plaintiff could not sustain this cause of action because once defendant had received the funds they went into defendant's general checking account and lost any specific identity); *see also Med. Recovery Servs., LLC v. Bonneville Billing & Collections, Inc.*, 157 Idaho at 401, 336 P.3d at 808 (holding that plaintiff could not sustain an action for conversion of funds because plaintiff offered no evidence or made any effort to trace the funds to establish its character as a specific chattel); *Zazzali v. Ellison*, 973 F. Supp. 2d 1187, 1209–10 (D. Idaho 2013) (dismissing plaintiff's conversion action where defendant commingled funds that were promised to be used for a specific purpose with company's general operating accounts because the very fact of the commingling forecloses an equitable claim for misappropriation under Idaho law); *Taylor v. McNichols*, 149 Idaho at 846–47, 243 P.3d at 662–63 (affirming district court's dismissal of plaintiff's conversion claim because nothing in the complaint suggested that the sums paid to defendants for their services could be described or identified as specific chattel).

Plaintiff directs the Court's attention to a case decided by the Idaho District Court that found that the wrongful negotiation of a check can be the basis of a conversion claim. *Howard v. Selene Fin.*, No. 3:18-CV-557-BLW, 2019 WL 1495254, at *4 (D. Idaho Apr. 4, 2019). In that case, the District Court denied a motion to dismiss because the plaintiff sufficiently alleged facts in the complaint to support a conversion claim

MEMORANDUM OF DECISION − 72

where the plaintiff alleged that defendant wrongfully negotiated a check that belonged to

plaintiff and that the check was personal property of the plaintiff.

The *Howard* decision is consistent with the other case law cited above and does

not aid Plaintiff. The District Court did not address the ultimate issue of whether

conversion had occurred but, rather, only considered whether the plaintiff had alleged

sufficient facts to support a claim for conversion. Because the check or funds could be

described as specific chattel based on the allegations in the complaint, the cause of action

was allowed to proceed. In fact, it appears that it was the check itself that was the subject

of the conversion claim. The District Court made no mention about the commingling of

converted funds, which would have foreclosed any cause of action for conversion.

Plaintiff's complaint, with respect to the conversion cause of action, states "The

[fee payments to Brookside] are specifically identifiable sums belonging to PSF

that Defendants wrongfully appropriated for themselves." In its pre-trial memorandum,

Plaintiff argues that Defendants are liable for conversion, stating:

> It was wrongful because while Brookside, through Weeks, represented to
> PSF that the payments were for the benefit of PSF, they were, in reality, for
> the sole benefit of Brookside and Weeks to grow Weeks' retirement
> company. So, in essence, Brookside and Weeks received money for which
> they provided no services in return.

Dkt. No. 35, p. 37. Although the "Deleted Payee Payments" involved the printing of

physical checks, the checks were deposited and, according to Plaintiff's counsel, "off it

goes to Mr. Weeks' bank account," presumably meaning the funds were then in Mr.

MEMORANDUM OF DECISION − 73

Weeks' bank account. There is no mention of whether these funds were kept specifically

identifiable once that occurred, nor is there any evidence to support such a contention.

The Court finds that Plaintiff has failed to sustain its burden with respect to this

cause of action. "Specifically identifiable sums" as articulated by Plaintiff is not the same

thing as specifically identifiable "chattel." In each of the cases cited above, the

identifiable sum of the transferred amount was not at issue. Rather, it was the character of

those funds as specific, identifiable chattel that was in question. Plaintiff has offered no

evidence that, once paid to Defendants, the funds retained their identity as specific

chattel. For this reason, Plaintiff's conversion cause of action will be denied.[19]

F.    Unjust Enrichment

"Unjust enrichment occurs where a defendant receives a benefit which would be

inequitable to retain without compensating the plaintiff to the extent that retention is

unjust." *Rosauer v. Detiege (In re Detiege)*, No. AP 19-08029-JMM, 2021 WL 2613735,

at *7 (Bankr. D. Idaho June 24, 2021) (quoting *Vanderford Co. v. Knudson*, 144 Idaho

547, 557, 165 P.3d 261, 271 (2007) (citing *Beco Constr. Co. v. Bannock Paving Co.*, 118

Idaho 463, 466, 797 P.2d 863, 866 (1990))).

---

[19] Moreover, the Court has significant doubts whether Plaintiff could have proven all of the conversion elements even if the funds were kept specifically identifiable after PSF issued the checks to Weeks and Brookside. Mr. Parkinson authorized the issuance of checks to both Weeks and Brookside, and testified that he knew the checks were being issued and the amount being paid to each Defendant, and thought that the amount was fair based on the services PSF received in return. Therefore, it is doubtful that Defendants wrongfully gained dominion over the checks or the funds.

MEMORANDUM OF DECISION – 74

To prove a prima facie case for unjust enrichment, Plaintiff must demonstrate that (1) Plaintiff conferred a benefit upon Defendant; (2) Defendant appreciated such benefit; and (3) Defendant accepted the benefit under circumstances that would be inequitable for Defendant to retain the benefit without compensating Plaintiff for the value thereof. *Vanderford Co. v. Knudson*, 144 Idaho at 557, 165 P.3d at 271.

"A person confers a benefit upon another if he or she gives the other some interest in money, land, or possessions, performs services beneficial to or at the request of the other, satisfies the debt of the other, or in any other way adds to the other's advantage." *Rosauer v. Detiege (In re Detiege)*, 2021 WL 2613735, at *8 (quoting *Med. Recovery Servs., LLC v. Bonneville Billing & Collections, Inc.*, 157 Idaho at 396, 336 P.3d at 805; 42 C.J.S. Implied Contracts § 9 (2013)).

Here, Plaintiff argues that there was in fact an employment contract or agreement, albeit unwritten, between the parties. *See* Plaintiff's Pre-Trial Memorandum, Dkt. No. 35, p. 31–32 (arguing that § 548(a)(1)(B)(ii)(IV) is applicable because the transfers were made in accordance with a verbal employment contract that existed between the parties).

Plaintiff argues Defendants were unjustly enriched as a result of the payments made to them by PSF despite a verbal employment agreement or contract that covered the same subject matter. Unjust enrichment, however, is not permitted where an enforceable express contract exists between the parties and covers the same subject matter. *Vanderford Co. v. Knudson*, 144 Idaho at 558, 165 P.3d at 272 (citing *DBSI/TRI v.*

MEMORANDUM OF DECISION – 75

*Bender*, 130 Idaho 796, 805, 948 P.2d 151, 160 (1997)). Plaintiff's unjust enrichment

claim, therefore, will be denied.

G.    <u>Breach of Fiduciary Duty</u>

Plaintiff argues that both Weeks and Brookside were fiduciaries who owed

fiduciary duties to PSF and that both defendants breached those duties. To prevail on this

claim, Plaintiff must prove that Defendants both owed and breached a fiduciary duty.

*Sorensen v. Saint Alphonsus Reg'l Med. Ctr., Inc.*, 141 Idaho 754, 760, 118 P.3d 86, 92

(2005) (quoting *Tolley v. THI Co.*, 140 Idaho 253, 261, 92 P.3d 503, 511 (2004)).

Plaintiff bears the burden of proving both of those elements. *Jordan v. Hunter*, 124 Idaho

899, 904, 865 P.2d 990, 995 (Ct. App. 1993).[20]

Determining whether a fiduciary relationship exists is a question of law. *Beaudoin*

*v. Davidson Trust Co.*, 151 Idaho 701, 705, 263 P.3d 755, 759 (2011). As stated above,

corporate officers and directors owe fiduciary duties to the corporation, but that is not the

only type of relationship that gives rise to a fiduciary relationship. Therefore, Defendants

may owe Plaintiff fiduciary duties even though they are not officers or directors of PSF.

---

[20] Idaho law recognizes a general rule that corporate officers and directors owe a fiduciary relationship to the corporation. *Jordan v. Hunter*, 124 Idaho at 904, 865 P.2d at 995–96; *Weatherby v. Weatherby Lumber Co.*, 492 P.2d 45 (Idaho 1972). To be clear, in a nondischargeability context under § 523(a)(4), this Court has previously rejected a broad adoption of Idaho's general rule that officers owe fiduciary duties to a corporation. *Streibick v. Murrell (In re Murrell)*, No. 03-21239, 2004 WL 1895200, at *9 (Bankr. D. Idaho Aug. 12, 2004). The Ninth Circuit, applying federal law, has adopted a narrow definition of fiduciary for § 523(a)(4), but that definition does not necessarily apply under the facts and cause of action here because, as stated above, Defendants may owe fiduciary duties to Plaintiff even if they are not directors or officers of the corporation. In other words, outside of the § 523(a)(4) context, a broader definition of fiduciary applies. Thus, the Court must consult with traditional Idaho state law to determine whether Defendants owed and breached a fiduciary duty.

MEMORANDUM OF DECISION – 76

"Fiduciary relationships are commonly characterized by one party placing property or authority in the hands of another, or being authorized to act on behalf of the other." *High Valley Concrete, LLC. v. Sargent*, 149 Idaho 423, 428, 234 P.3d 747, 752 (2010) (quoting *Country Cove Dev., Inc. v. May*, 143 Idaho at 603, 150 P.3d at 296).

In *Skinner v. U.S. Bank Home Mortg.*, the Idaho Supreme Court stated:

> A fiduciary relationship does not depend upon some technical relation created by or defined in law, but it exists in cases where there has been a special confidence imposed in another who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of one reposing the confidence.

*Skinner v. U.S. Bank Home Mortg.*, 159 Idaho 642, 647, 365 P.3d 398, 403 (2016) (quoting *Jones v. Runft, Leroy, Coffin & Matthews, Chtd.*, 125 Idaho 607, 614, 873 P.2d 861, 868 (1994)).

"Generally speaking, where one party is 'under a duty to act or to give advice for the benefit of the other upon a matter within the scope of the relation,' a fiduciary relationship exists." *City of Meridian v. Petra Inc.*, 154 Idaho 425, 441, 299 P.3d 232, 248 (2013) (quoting *Beaudoin v. Davidson Tr. Co.*, 151 Idaho at 705, 263 P.3d at 759).

The Idaho Supreme Court has elaborated on the circumstances that give rise to fiduciary relationships:

> The term fiduciary implies that one party is in a superior position to the other and that such a position enables him to exercise influence over one who reposes special trust and confidence in him . . . . As a general rule, mere respect for another's judgment or trust in this character is usually not sufficient to establish such a relationship. The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party.

MEMORANDUM OF DECISION − 77

*Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 278, 824 P.2d 841, 853

(1991) (quoting *Burwell v. S.C. Nat'l Bank*, 288 S.C. 34, 340 S.E.2d 786, 790 (1986)). In

other words, under Idaho law, a person may owe fiduciary duties to a corporation even

where that person is not an officer or director of the corporation.

 The Idaho Supreme Court has provided a list of examples of relationships that

could give rise to a fiduciary relationship, including when the parties are members of the

same family, partners, attorney and client, executor and beneficiary of an estate, principal

and agent, insurer and insured, or close friends. *High Valley Concrete, LLC v. Sargent*,

149 Idaho at 428, 234 P.3d at 752 (citing *Wade Baker & Sons Farms v. Corp. of*

*Presiding Bishop of Church of Jesus Christ of Latter–Day Saints*, 136 Idaho 922, 928, 42

P.3d 715, 721 (Ct. App. 2002)).

 Of those relationships enumerated above, the most relevant here is that of a

principal and agent. An agent is a person who is authorized to act on behalf of a principal

to accomplish certain tasks. *Humphries v. Becker*, 159 Idaho 728, 735, 366 P.3d 1088,

1095 (2016) (citing *Knutsen v. Cloud*, 142 Idaho 148, 151, 124 P.3d 1024, 1027 (2005)).

An agency relationship arises through the actions of the principal where the principal,

whether expressly, impliedly, or apparently, grants the agent authority to conduct certain

actions on his or her behalf. *Id.*

 There are three essential characteristics courts examine to determine whether an

agency relationship exists between two parties. First, whether the agent has the power to

alter legal relations between the principal and third persons. Second, whether the agent

MEMORANDUM OF DECISION – 78

owes a fiduciary duty to the principal to act primarily for the principal's benefit in matters

connected with the undertaking. Lastly, whether the principal has a right to control the

conduct of the agent. *Nelson v. Kaufman*, 166 Idaho at 277, 458 P.3d at 146 (citing

Restatement (Second) of Agency §§ 12–14).

Although Weeks was never a W-2 employee with PSF, and Brookside argues it

was an independent contractor, and thus did not owe PSF fiduciary duties, in certain

circumstances, an independent contractor may also be considered an agent under Idaho

law. *Nelson v. Kaufman*, 166 Idaho at 278, 458 P.3d at 147. "These limited circumstances

exist when the contractor is a fiduciary owing the purported principal 'the basic

obligations of agency: loyalty and obedience.'" *Id.* at 277, 458 P.3d at 146 (citing

Restatement (Second) of Agency § 14N cmt. a). At a minimum, the same three essential

characteristics described above must be proven in order to establish an independent

contractor is an agent owing fiduciary duties to a principal. *Id.* at 278, 458 P.3d at 147.

The Court finds that Weeks was PSF's agent. Weeks often collaborated with Mr.

Parkinson, PSF's CPA, and PSF's former attorney to draft important documents that were

used in PSF's ongoing business enterprise, as well as PSF's bankruptcy. Additionally,

Weeks was required to act primarily for the benefit of PSF, the principal. Weeks

essentially ran the entire administrative office for PSF, communicated with third parties

on behalf of PSF, produced documents that were sent to banks and lenders, and made

decisions that directly affected PSF's operations. The Court determined above that Weeks

was a non-statutory insider of PSF. Moreover, Weeks had Mr. Parkinson's signature

MEMORANDUM OF DECISION − 79

stamp which Weeks would use to sign PSF's outgoing checks and, because Mr.

Parkinson had authorized Weeks to stamp and deliver such checks, most of these checks

were stamped and delivered without Mr. Parkinson's individual review of each check

independently. Finally, Weeks was subject to PSF's control by way of its president, Mr.

Parkinson. Although Weeks performed the work, it is clear that the work was subject to

PSF's control throughout the entire relationship. Thus, as its agent, Weeks owed

fiduciary duties to PSF.

It is not as clear to the Court that Brookside was PSF's agent. The duties and

responsibilities held by Brookside differed from those held by Weeks. While Weeks

clearly had the ability to alter PSF's relationships with third parties, there is scant

evidence that Brookside held that same authority. With regard to the second element,

Brookside did act in PSF's best interest throughout the course of their relationship.

Finally, PSF did not exercise as much control over Brookside as it did over Weeks. PSF

did, however, exercise control over Weeks, who controlled Brookside. Although slight,

there is sufficient evidence that PSF controlled Brookside. These characteristics that are

essential to forming a principal-agent relationship are not balancing factors, but are

elements which must be proven. Plaintiff bears the burden of proving Brookside owed

fiduciary duties to PSF, and thus must establish the existence of a principal-agent

relationship, but Plaintiff has failed to show that Brookside could alter PSF's relationship

with third parties. As such, Plaintiff has failed to sustain its burden with respect to

Brookside, and the Court finds that it owed no fiduciary duties to PSF.

MEMORANDUM OF DECISION – 80

Having determined that Weeks was an agent and, therefore, owed fiduciary duties to PSF, the Court next turns to whether he breached those duties. Agents owe principals the fiduciary duties of loyalty and good faith and fair dealing. *Rockefeller v. Grabow*, 136 Idaho 637, 647, 39 P.3d 577, 587 (2001); Restatement (Third) Of Agency § 8.01 (2006).

"Although an agent's interests are often concurrent with those of the principal, the general fiduciary principle requires that the agent subordinate the agent's interests to those of the principal and place the principal's interests first as to matters connected with the agency relationship." Restatement (Third) Of Agency § 8.01, cmt. b (2006).

Notably, the Restatement of Agency recognizes situations where a principal may authorize an agent's conduct that may otherwise violate a fiduciary duty:

> A principal may, of course, manifest assent to a transaction effected by an agent that constitutes a gift of the principal's property or another unselfish action on the part of the principal. The agent's duty to the principal obliges the agent to act in accord with a reasonable interpretation of the principal's manifestation, even when the agent believes that doing so is not in the principal's best interests.

*Id.*

Conduct by an agent that would otherwise constitute a breach of a fiduciary duty does not constitute a breach of duty if the principal consents to the conduct, provided that:

> (a) in obtaining the principal's consent, the agent
>     (i) acts in good faith,
>     (ii) discloses all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and

MEMORANDUM OF DECISION − 81

(iii) otherwise deals fairly with the principal; and

(b) the principal's consent concerns either a specific act or transaction, or acts or transactions of a specified type that could reasonably be expected to occur in the ordinary course of the agency relationship.

*Id.* at § 8.06(1).[21]

The facts before the Court present precisely the type of situation that the Restatement of Agency addresses. Weeks was PSF's agent and received compensation for his services. Plaintiff essentially argues that Weeks breached his fiduciary duty by taking more compensation than what he should have received because Brookside, after it was formed, was effectively performing the same work for PSF that Weeks had already been performing for PSF. However, Mr. Parkinson, as PSF's president at the time, was fully aware of the compensation being paid to Weeks and PSF, and those payments or transactions regularly occurred in the course of both agency relationships. Many of the QuickBook entries for those disbursements, at least before Mr. Parkinson ordered them to be changed, showed that the disbursements were made from the "Payable Dirk Parkinson" account. Mr. Parkinson exercised a great amount of control over Weeks' work. In addition, the evidence indicates that Weeks and Brookside both dealt fairly with PSF and took less compensation than what had originally been agreed.

---

[21] Many courts are in accord. *Est. of Kuhling by Kuhling v. Glaze*, 2018 VT 75, ¶ 19, 208 Vt. 273, 283, 196 A.3d 1125, 1132 (2018); *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 746 (D. Minn. 2009), *adhered to*, 711 F. Supp. 2d 991 (D. Minn. 2010), *aff'd*, 650 F.3d 1139 (8th Cir. 2011), *aff'd*, 650 F.3d 1139 (8th Cir. 2011); *Television Events & Mktg., Inc. v. Amcon Distrib. Co.*, 526 F. Supp. 2d 1118, 1133 (D. Haw. 2007).

MEMORANDUM OF DECISION − 82

In sum, the Court finds that a principal-agent relationship existed between Weeks and PSF and, accordingly, Weeks owed fiduciary duties to PSF. Weeks did not breach those fiduciary duties, however, for the reasons specified above.[22]

H.   <u>Attorney Fees and Costs</u>

Plaintiff and Defendants have requested attorney's fees. At this juncture, the Court will not address these requests. Instead, the parties are directed to submit simultaneous briefs within fourteen (14) days of the entry of this decision in support of their respective position on attorney's fees. At a minimum, parties should discuss the authority under which they are entitled to attorney's fees, the prevailing party, and the amount being sought.

*** Conclusion ***

The causes of action against Defendant Arlo Weeks will be denied. Plaintiff's first cause of action under §§ 548(a)(1)(B) against Brookside will be granted in the amount of $133,368.67. Plaintiff's third cause of action under § 549 will be granted with respect to Brookside in the amount of $79,145.97. Plaintiff's fourth cause of action for fraud will be granted with respect to Brookside in the amount of $2,332, although Plaintiff also

---

[22] Even assuming that Plaintiff sustained its burden in proving Brookside was PSF's agent, and thus owed PSF fiduciary duties, for many of the same reasons enumerated here with respect to Weeks, Brookside likely did not breach any of those duties. Again, Mr. Parkinson, as PSF's president, was aware of the payments being made to Brookside and expressly authorized those payments to be made on behalf on PSF. Although Weeks did intend that Brookside become a company that could provide some type of retirement for him individually, that does not negate the fact that Brookside did provide services to PSF, and Mr. Parkinson thought the payments to Brookside were fair for the services being provided.

MEMORANDUM OF DECISION − 83

successfully recovered this amount under its first cause of action. All other causes of

action against Brookside will be denied. The parties are directed to submit simultaneous

briefs within fourteen (14) days of the entry of this decision in support of their position

on attorney's fees.

In total, Plaintiff will be allowed to recover $212,514.64 from Brookside.[23]



DATED:  February 18, 2022

_____

JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

---

[23] Plaintiff successfully argued for the recovery of $2,322 for fees reimbursed to Brookside from PSF for services that were actually provided to Idaho Springs Water Company under two separate causes of action: § 548 and fraud. This total amount represents only a single recovery of that amount.

MEMORANDUM OF DECISION – 84